O.F. DUFFIELD, Plaintiff–Appellee,

v.

FIRST INTERSTATE BANK OF DENVER, N.A., Defendant–Appellant.

No. 92–1077.

United States Court of Appeals, Tenth Circuit.

Dec. 23, 1993.

Rehearing Denied Feb. 1, 1994.

Stephen R. McAllister (Larry L. Simms, with him on the briefs) of Gibson, Dunn & Crutcher, Washington, DC, for defendant-appellant.

Robert G. Good of Good & Good, P.C., Englewood, CO (Timothy D. Good of Good & Good, P.C., Englewood, CO, Philip G. Dufford, Douglas P. Ruegsegger, and Terry Jo Epstein of Welborn Dufford Brown & Tooley, P.C., Denver, CO, with him on the brief), for plaintiff-appellee.

Before McKAY, Chief Judge, SEYMOUR, Circuit Judge, and LEONARD, District Judge.[*]

McKAY, Chief Judge.

## I.

In this diversity action, First Interstate Bank of Denver, N.A. (hereinafter "the Bank") appeals a jury's award of $6,000,000 to O.F. Duffield on his breach of contract claims.

In 1983, Mr. Duffield borrowed $2,000,000 from the Bank on an unsecured basis. In 1984, Mr. Duffield posted his interest in various gas and oil wells as collateral for the loan pursuant to the terms of a Promissory Note, Mortgage, Deed of Trust, Assignment, Security Agreement and Financing Statement (hereinafter collectively referred to as "the agreement"). Pursuant to the agreement, he was required to pay approximately $41,000 per month in principal and $18,000 per month in interest.

In July of 1985, Mr. Duffield's daughter died and he fell behind in his payments to the Bank. Although the July payment was eventually made, Mr. Duffield became delinquent in his August and September payments as well. During the period when Mr. Duffield was in mourning over the loss of his daughter, Mr. Duffield's office manager, Robert Duppman, managed his business affairs. In September, Robert Duppman contacted the Bank regarding Mr. Duffield's past-due account and informed them that Mr. Duffield had agreed to sell one of his properties (the Long Butte property) held as collateral by the Bank in order to catch up his loan payments. Mr. Duppman was informed by Brian Erickson, a Bank vice president, that the release value of the property was $382,000.

Mr. Duffield argues that in exchange for $460,000, the Bank orally agreed to release the property, catch up the delinquent payments, and prepay a month or two of future payments so Mr. Duffield would not have to concern himself with his business affairs while mourning the loss of his daughter. The Bank contends no agreement to pay arrearages or future payments was ever made.

On September 11, 1985, the Bank applied the entire amount of the $460,000 to principal in inverse order,[1] which had the effect of leaving Mr. Duffield past due in his interest and principal payments. On October 2, 1985, the Bank exercised a right of assignment contained in section 3.1 of the Mortgage by mailing to the operators of Mr. Duffield's wells a request to thereafter send all proceeds directly to the Bank. The following day, the Bank notified Mr. Duffield of its actions and cited as justification various defaults including Mr. Duffield's past-due payments for August, September, and October; a borrowing base deficiency;[2] the breach of Mr. Duffield's representation of warranty as it related to prior liens on the Long Butte property; and Mr. Duffield's failure to pro-

---

[*] Honorable Timothy D. Leonard, United States District Judge for the Western District of Oklahoma, sitting by designation.

[1.] Inverse order is the term used to describe the practice of applying proceeds from a collateral sale to the back end or last principal payments that will be due on a loan. (Appellant's Br. at 7 n. 7.)

[2.] A borrowing base deficiency occurs when the loan value is less than the outstanding principal due on the loan. The loan value is the maximum dollar amount (usually less than 100% of the estimated market value) a bank will loan on a particular piece of collateral. (Appellant's Br. at 3–4 n. 3.)

vide the Bank with an updated financial statement. The Bank also complained of an alleged misrepresentation by Mr. Duffield regarding the amount he received for the Long Butte property.[3]

In November 1985, the Bank began receiving proceeds from Mr. Duffield's operators. These proceeds were applied to Mr. Duffield's loan pursuant to the terms of the Mortgage. Mr. Duffield soon lost all of his oil and gas interests because of the damage to his credit caused by the Bank's actions. In 1988, the Bank sold Mr. Duffield's note which continues to carry a principal balance of approximately $1,400,000.

In 1990, Mr. Duffield brought this action asserting that the Bank breached an oral contract to apply the proceeds of the Long Butte sale to arrearages and to future payments, breached the notice provisions of the Mortgage by not giving Mr. Duffield advance notice of its intention to exercise its assignment rights, and breached the covenant of good faith and fair dealing. Mr. Duffield claimed the Bank's seizure of his oil runs made it impossible for him to pay the operating expenses of his wells, and that as a result, he lost all of his gas and oil interests. The jury found in Mr. Duffield's favor and awarded $6,000,000. The Bank appeals.

## II.

■ Because it is dispositive of this appeal, the only issue we need to address is whether the Bank breached an implied covenant of good faith and fair dealing. Mr. Duffield argues that he had a legitimate expectation that the Bank would exercise its rights to the proceeds of his oil fields only upon a reasonable belief that he was in default and only after providing him with notice sufficient to allow him to cure those defaults. Because the Bank did not follow these procedures, he argues, it breached its duty of good faith and fair dealing. The Bank, relying on *Gilmore v. Ute City Mortgage Co.*, 660 F.Supp. 437 (D.Colo.1986), argues that under Colorado law the duty to act in good faith does not apply to a contract provision that

unambiguously defines the duties of the parties, and that the contract unambiguously permitted the Bank's actions. In *Gilmore*, a federal district court, purporting to apply Colorado law, held that the implied duty of good faith and fair dealing cannot override express contractual terms. The court stated that the covenant of fair dealing does not take on a "life of its own outside the confines of the contract and superimpose an additional condition on the operation of [a party's] contractual rights." *Id.* at 442.

■ Even assuming the contract is unambiguous, we do not believe that the holding in *Gilmore* is an accurate reflection of Colorado law. Indeed, the *Gilmore* opinion cites no authority for its proposition that Colorado law applies the implied covenant of good faith and fair dealing only to ambiguous terms in a contract. We note that Colorado has adopted Article 1, § 203 of the Uniform Commercial Code, which states: *"Every* contract or duty within this title imposes an obligation of good faith in its performance or enforcement." Colo.Rev.Stat. § 4–1–203 (1992) (emphasis added). The Official Comment further states that "[t]he principle involved is that in commercial transactions good faith is required in the performance and enforcement of *all* agreements or duties." Colo.Rev.Stat. § 4–1–203 cmt. (1992) (emphasis added). This provision on its face appears to apply in all situations—including when a contract's express terms do not limit either party's right to act unreasonably. Also important is the fact that the comment to § 4–1–203 specifically cross-references, *inter alia,* § 4–1–208, which expressly requires good faith with respect to enumerated contract terms that would otherwise permit a party to exercise them at will. *Id.*

Turning to the case law, in several instances Colorado courts have held that even though the express terms of a contractual provision appeared to permit unreasonable actions, the implied duty of good faith and fair dealing limited the parties' ability to act unreasonably in contravention of the other

---

**3.** The Bank argues that Duffield informed them that the purchase price was $460,000 when the price was in fact $750,000.

party's reasonable expectations. *See, e.g. Navajo Freight Lines, Inc. v. Moore,* 170 Colo. 539, 463 P.2d 460, 461 (1970) (where defendant agreed to pay plaintiff a percentage of funds to be collected, an implied duty arose to make a good faith attempt to collect funds); and *Ruff v. Yuma County Transp. Co.,* 690 P.2d 1296, 1298 (Colo.App.1984) (defendant who promised to purchase a transportation route upon ICC approval breached implied covenant of good faith and fair dealing by not seeking ICC approval). *See also Nix v. Clary,* 640 P.2d 246, 247 (Colo.App. 1981). Thus, we believe that Colorado law required the Bank in this case to exercise its rights to the proceeds and provide notice to Mr. Duffield in accordance with traditional notions of good faith and fair dealing.

This court recently discussed the good faith and fair dealing provision of the U.C.C. at length in *Big Horn Coal Co. v. Commonwealth Edison Co.,* 852 F.2d 1259 (10th Cir. 1988). In *Big Horn,* the court explained that "where a contract provision is exercisable only at some discretion of one of the parties, and expectations are created by the contract, good faith limitations are applicable to protect the non-exercising party from unexpected invocation of the option." *Id.* at 1269 n. 15. We believe that this language applies equally to the present case. The option to begin receiving proceeds from Mr. Duffield's collateral could be invoked at the Bank's discretion only. Furthermore, the undisputed facts in this case persuade us that Mr. Duffield had a legitimate expectation that the Bank would exercise its assignment rights in good faith—that is, only upon a reasonable belief that he was in default and only after providing him with notice sufficient to allow him to cure any defaults. We believe that the proper interpretation of the agreement and its surrounding circumstances mandate the conclusion that the agreed common purpose of the loan and security agreements was to permit Mr. Duffield to repay the loan within its terms through the continued operation of his business.

Several facts lead to this conclusion. The Bank initially loaned Mr. Duffield over two million dollars on an unsecured basis. After later providing collateral, the Mortgage itself contemplated in section 2.7 that Mr. Duffield could continue to sell "severed Hydrocarbons in the ordinary course of [his] business" by excluding such sales from the provision that Mr. Duffield would not otherwise sell mortgaged property without consent. The Bank permitted Mr. Duffield to keep and sell the severed hydrocarbons through October of 1985, creating a reasonable expectation that he could continue to do so absent default. The proceeds from the oil runs were usually sufficient to allow Mr. Duffield to make the loan payments. Finally, as the jury found, Mr. Erickson led Mr. Duffield's agent to believe that the status quo would be maintained if Mr. Duffield sold some collateral and provided the Bank with the proceeds. There was sufficient evidence in the record for the jury to arrive at this conclusion. *See Comcoa, Inc. v. NEC Teles., Inc.,* 931 F.2d 655, 663 (10th Cir.1991). Mr. Duffield also had other properties that he could have sold or applied as collateral had the Bank allowed him adequate time to cure. All of these facts together lead us to believe that the common purpose of the loan was to allow Mr. Duffield to continue to operate his business and repay the loan within its terms. The Bank created a reasonable expectation in Mr. Duffield that the assignment provision would not be used absent a good reason and an adequate chance to cure so that the basic structure of the loan would not be frustrated. Thus, under both *Big Horn* and Colorado law, the Bank breached an implied covenant of good faith and fair dealing by invoking the assignment provision without reasonable prior notice and without a good faith basis for doing so.

We also hold that the district court did not err in letting stand the jury award for $6,000,000. Under Colorado law, the test for consequential damages for breach of contract is essentially one of foreseeability. *See International Technical Instruments, Inc. v. Engineering Measurements Co.,* 678 P.2d 558, 563 (Colo.App.1983); *Husband v. Colorado Mountain Cellars,* 867 P.2d 57, 60 (1993); and *Dillingham v. University of Colorado,* 790 P.2d 851, 855 (Colo.App.1989). The evidence is undisputed that the Bank's action of taking over the runs devastated Mr. Duffield's credit and his ability to operate the

wells. It is also clear from the testimony of Mr. Erickson on cross-examination that the Bank foresaw the extent of damage that its actions could have on Mr. Duffield's business interests. (Rec. Vol. VI at 881–882.) At trial, Mr. Duffield presented adequate evidence to the jury concerning nexus and causation to justify the jury's decision. He demonstrated that his damages were in the general range of $6,000,000. The jury's award was not so excessive as to shock the judicial conscience or raise inferences that passion, prejudice, corruption, or other improper considerations invaded the trial. *See MidAmerica Fed. Sav. & Loan Ass'n v. Shearson/American Express, Inc.*, 886 F.2d 1249, 1259 (10th Cir.1989). Thus, the judgment of the jury and the district court must be affirmed.

AFFIRMED.