(870 P.2d 700)
No. 69,718

JAMES and JUDY GILLENWATER, *Appellants,* v. MID-AMERICAN BANK
AND TRUST COMPANY, f/k/a KAW VALLEY BANK, and f/k/a KAW
VALLEY STATE BANK AND TRUST, *Appellee.*

Opinion
filed March 18, 1994.

Dana L. Parks, Frank B. W. McCollum, and Nancy Merrill Wilson, of Hamann Holman South McCollum & Hansen, P.C., of Prairie Village, for appellants.

Michelle M. Suter, of Kurlbaum, Stoll, Seaman & Reefer, P.C., of Kansas City, Missouri, for appellee.

Before BRISCOE, C.J., ELLIOTT and LEWIS, JJ.

ELLIOTT, J.: James and Judy Gillenwater appeal the summary judgment in their suit against Kaw Valley Bank, now Mid-American Bank and Trust Company (Bank). The Gillenwaters claim the Bank sold their collateral at public auction in a commercially unreasonable manner, failed to preserve their collateral, tortiously interfered with an existing business relationship, breached its duty of good faith and fair dealing, and converted their property interest.

We affirm.

Among the uncontroverted facts found to exist are the following: The Gillenwaters are licensed real estate brokers. In 1985, they sold some storefronts in Overland Park to Commercial Renovations, a partnership. The Gillenwaters took a note from Commercial Renovations in the amount of $175,000, payable on June 1, 1990. The note was secured by a mortgage on the storefronts and was personally guaranteed by Mark Douglas Rose, a partner in Commercial Renovations. Subsequently, Commercial Renovations placed a second mortgage on the storefronts through the Mission Bank.

In June of 1987, the Gillenwaters borrowed $85,000 from the Bank, payable on June 12, 1988. As security, they pledged the $175,000 note from Commercial Renovations with the guaranty by Rose. The 1987 note to the Bank was reviewed in 1988 and 1989.

In May of 1990, Commercial Renovations notified the Gillenwaters it would not be able to pay its note to them on June 1, 1990. The Gillenwaters notified the Bank of that fact. While the Gillenwaters sent an acceleration letter to Rose, they did not seek

any legal or financial advice in connection with the Commercial Renovations default. The Gillenwaters made no effort to refinance the Bank's note with any other person or institution.

The Bank and the Gillenwaters never reached any agreement as to liquidation of the pledged collateral. The Bank sent a letter to the Gillenwaters' attorney indicating its intention to conduct a Uniform Commercial Code sale of the pledged Commercial Renovations note. A copy of the notice of sale was also published in the Kansas City Star and in Bank News.

The Gillenwaters were represented at the sale by their attorneys. The Bank bid $94,557.54 on the note, the total amount then due on the note from the Gillenwaters. No deficiency was sought from the Gillenwaters. The sale was a public sale.

The Bank later sold the Commercial Renovations note to the Mission Bank for the balance due under the 1989 note from the Gillenwaters, including all costs associated with the sale. The Bank received no premium from the Mission Bank for the purchase of the Commercial Renovations note.

The Gillenwaters never contacted anyone at the Bank to attempt to postpone the UCC sale for the purpose of obtaining financing in order to buy the Commercial Renovations note.

Prior to the UCC sale, Judy Gillenwater spoke with a banker who advised her that since the Commercial Renovations note was in default, it was probably not a saleable item. James Gillenwater did not know of any person, party, or company that would buy the Commercial Renovations note for $175,000 in September of 1990.

Further, the Gillenwaters did not provide any bidding instructions with respect to the UCC sale, nor did they contact anyone to attend the UCC sale and bid on the note.

In awarding summary judgment in favor of the Bank, the trial court ruled that the sole basis for the claims brought by the Gillenwaters is the fact that the face value of the defaulted note from Commercial Renovations exceeds the face value of their 1989 note to the Bank. The trial court also found that the Gillenwaters had never been in any business relationship with Commercial Renovations or Rose. In fact, the only transaction between Rose, Commercial Renovations, and the Gillenwaters (other than a prior

sale of some fish to Rose), was the execution of the Commercial Renovations note and the guaranty.

Finally, the trial court found there was simply no evidence to support the Gillenwaters' claim of conversion by the Bank or their claim of breach of good faith and fair dealing.

The purpose of summary judgment is to avoid a trial where there is no real issue of fact. *Bethany Medical Center v. Knox,* 10 Kan. App. 2d 192, 193, 694 P.2d 1331 (1985). And in order to avoid summary judgment, the nonmoving party must establish each element of its claim for relief. *Dozier v. Dozier,* 252 Kan. 1035, 1041, 850 P.2d 789 (1993).

### The claim that the Bank's sale
### of the collateral was commercially unreasonable

It must be remembered that the collateral sold by the Bank was the Commercial Renovations *note* and *not* the three store-fronts. We know of no authority that would require the Bank to foreclose the underlying mortgage on the storefronts.

K.S.A. 84-9-504 provides that the Bank, as a secured party, may sell its collateral after default. And disposition of the collateral may be by public or private sale, so long as all aspects of the sale are commercially reasonable and so long as reasonable notice of the time and place of any public sale is given to the debtor.

The purpose of the commercial reasonableness requirement is to protect the debtor from an avoidable deficiency judgment or the squandering of a possible surplus through the creditor's in-actions. *Federal Deposit Ins. v. Fort Worth Aviation,* 806 F.2d 575, 577 (5th Cir. 1986).

The leading Kansas case for evaluating commercial reasonable-ness is *Westgate State Bank v. Clark,* 231 Kan. 81, 642 P.2d 961 (1982). *Clark* lists nine factors to be considered when determining the commercial reasonableness of a UCC sale, some of which simply do not apply to the sale of a promissory note. See 231 Kan. at 92-95.

Whether a public or private sale is the more commercially reasonable must be determined from the nature of the collateral and other factual circumstances. 231 Kan. at 92-93.

In the present case, the Gillenwaters offered an appraisal of the storefront properties and affidavits from tenants who professed

interest in buying portions of the storefront properties. The Gillenwaters fail to recognize that the collateral being sold was the note rather than the storefront properties. James Gillenwater was unaware of the existence of any person interested in paying $175,000 for the defaulted note at the time of the UCC sale, and a banker had advised Judy Gillenwater that the defaulted note was probably not a saleable item.

Disposition of the collateral as a unit or in parcels, another *Clark* factor, is not applicable to the present case. The collateral was a single note, not three storefront properties. The UCC does not require the Bank to foreclose the underlying mortgage, a matter which would have been complicated in the present case by the existence of the Mission Bank's second mortgage. Absent statutory or contractual provisions to the contrary, there is no requirement for the secured creditor to foreclose on a note given to secure a debt before pursuing the makers. *Park Tucson Investors Ltd. Partnership v. Ali*, 770 F. Supp. 531, 536 (D. Ariz. 1991).

Likewise, the trial court properly ruled the Bank adequately publicized the sale, another *Clark* factor. See 231 Kan. at 93. The Bank published notice of the sale in both The Kansas City Star and in Bank News and further gave individual notice to six financial institutions.

Another *Clark* factor is the actual price realized for the collateral. A showing that the collateral was sold a short time later at a disproportionately higher price may indicate the secured creditor failed to receive a fair price at the UCC sale. 231 Kan. at 94-95. Such is simply not the case in the present action. It is undisputed that the Bank did not receive any premium in its subsequent sale of the Commercial Renovations note to the Mission Bank. The Gillenwaters presented no evidence of what the fair market value of the defaulted note might be. And sale price by itself is not sufficient to establish commercial unreasonableness. See *U.S. v. Cox*, 731 F. Supp. 1023, 1025-26 (D. Kan. 1990); *Union Nat'l Bank of Wichita v. Schmitz*, 18 Kan. App. 2d 403, Syl. ¶ 6, 853 P.2d 1180 (1993).

The trial court did not err in granting the Bank summary judgment on count I of the Gillenwaters' petition.

### Preservation of the collateral

The Bank, as a secured party, must use reasonable care to preserve the collateral in its possession. K.S.A. 84-9-207(1). The UCC simply incorporates the common-law duty of a pledgee to preserve the collateral pledged to it. See K.S.A. 84-9-207(1), Official UCC Comment 1.

In the present case, we conclude the Bank adequately preserved the defaulted note, which the Gillenwaters had been advised was not a saleable item. Further, the Gillenwaters made no attempt to refinance their debt to the Bank, gave their attorneys no bidding instructions for the UCC sale, and made no efforts to send someone to the sale to purchase the defaulted note.

### The claim of tortious interference with a business relationship

The Gillenwaters claim the Bank tortiously interfered with their business relationship with Commercial Renovations/Rose. The trial court concluded no business relationship existed between the Gillenwaters and Commercial Renovations/Rose.

In order to state a claim for tortious interference, a plaintiff must establish *intentional misconduct* by the defendant. *Reazin v. Blue Cross and Blue Shield of Kansas*, 899 F.2d 951, 977 (10th Cir.), *cert. denied* 497 U.S. 1005 (1990).

Further, interference can be justified in certain situations, as where the defendant acts in the exercise of a right at least equal to that of the plaintiff. *Turner v. Halliburton Co.*, 240 Kan. 1, 12-13, 722 P.2d 1106 (1986).

In the present case, the Bank was merely exercising its rights under the UCC to dispose of the Commercial Renovations note it held as collateral. And there is no evidence of a malicious intent on the Bank's part, which is required by *Turner* and *Reazin* before a claim of tortious interference can be established.

The trial court properly granted summary judgment on this issue.

### The claim that Bank breached its duty of good faith and fair dealing

Every contract under the UCC imposes an obligation of good

faith in its enforcement. K.S.A. 84-1-203. The duty of good faith has been defined as honesty in fact. *Iola State Bank v. Bolan*, 235 Kan. 175, 183, 679 P.2d 720 (1984). The test of good faith against lenders by borrowers is subjective. *Daniels v. Army National Bank*, 249 Kan. 654, 658, 822 P.2d 39 (1991).

The question of good faith may be decided as a matter of law under proper circumstances. See *Schaller v. Marine Nat. Bank*, 131 Wis. 2d 389, 402, 388 N.W.2d 645 (1986).

Since Kansas has adopted the "honesty in fact" test, in order to prevail on this claim, the Gillenwaters must offer proof of dishonesty on the part of the Bank.

The trial court correctly ruled that no evidence of dishonesty was presented, and the trial court properly granted summary judgment on the issue.

### The claim of conversion

Finally, the Gillenwaters claim the Bank converted their property interest in the Commercial Renovations note. The Gillenwaters cite no authority to support their claim of conversion.

Raising a conversion claim in a disposition of collateral dispute is somewhat rare. The Bank, in the present case, was a secured party in possession of collateral following default by the Gillenwaters. Liability for a breach of the secured party's duties under the UCC are provided by the UCC itself, and a breach of a UCC obligation does not constitute a conversion. See *Keller v. La Rissa, Inc.*, 586 P.2d 1017, 1020 (Hawaii 1978).

The Bank took possession of the collateral and disposed of it pursuant to its rights granted by the UCC; accordingly, the Bank's exercise of dominion and control was not unauthorized. The trial court properly granted summary judgment on this issue.

Affirmed.