**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 14, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

COBANK, ACB,

      Plaintiff-Appellee,

v.

REORGANIZED FARMERS
COOPERATIVE ASSOCIATION, a
Kansas cooperative association; FCA
POST-CONFIRMATION TRUST, a
Kansas trust established pursuant to
the confirmed reorganization plan of
the Farmers Cooperative Association,

      Defendants-Appellants.

No. 04-3385
(D. Kan.)
(D.Ct. No. 02-CV-1300-JTM)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **HARTZ**, Circuit Judge.

Appellant The Reorganized Farmers Cooperative Association and its

successor-in-interest in bankruptcy, FCA Post-Confirmation Trust (referred to

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

together hereafter as the Cooperative), appeal the district court's decision granting summary judgment in favor of Appellee CoBank, ACB, on the Cooperative's claims of breach of contract, breach of duty of good faith and fair dealing, fraud, breach of fiduciary duty, and tortious interference with contract, which relate to default on a loan agreement between CoBank, as the lender, and the Cooperative, as the borrower. Exercising our jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. Background

The relevant facts are undisputed, with the exception of certain facts which the district court found immaterial to its summary judgment determination and which we address hereafter. To begin, CoBank is an agricultural lending bank chartered as a federal instrumentality, with its principal place of business in Colorado, and the Cooperative is an organization formed by a collection of farmers under the laws of the State of Kansas, with its principal place of business in Kansas. On or about January 31, 2000, the Cooperative and CoBank entered into a Master Loan Agreement (loan agreement) which was subsequently amended on August 2, 2000.

Under the terms of the loan agreement, the Cooperative obtained both

revolving and term loans based in part on a requirement it maintain working capital of $1 million at the end of each fiscal year, ending on July 31 of each year. It also provided any modification of the agreement must be approved by CoBank, in writing, and signed on behalf of CoBank. The loan agreement, as amended, also contained a default provision which stated CoBank had no obligation to continue to extend credit to the Cooperative for any default event and in the event of such a default could discontinue extending credit at any time without prior notice. It also provided that in the event of default CoBank could, on notice to the Cooperative, terminate any commitment.

On September 21, 2000, accountants presented the Cooperative with a preliminary audit showing an operating loss of approximately $1.6 million for the fiscal year and a violation of the working capital section of the loan agreement requiring $1 million in working capital. Prior to the audit the Cooperative reported working capital of $1.7 million for the 2000 fiscal year, while after the audit its actual working capital totaled only $102,363. The next day, Friday, September 22, 2000, the Cooperative advised CoBank of the results of the preliminary audit. On the same day, a CoBank representative, David Ehret, met with the Cooperative's president and chief executive officer, Don Dumler, to discuss the Cooperative's default on the terms of the loan agreement and verbally

advised Mr. Dumler that the Cooperative could continue to pay expenses necessary to preserve CoBank's collateral, such as payroll and utilities, and to buy grain, provided it was purchased and sold in back-to-back transactions.[1] Although neither party discussed the amounts necessary to cover such expenditures, Mr. Ehret anticipated only minimal expenses and back-to-back grain sales over the weekend.

While it is disputed whether CoBank otherwise restricted or froze the Cooperative's line of credit immediately after obtaining the audit report, it is undisputed that on Monday, September 25, 2000, the next business day after receiving the audit, Mr. Ehret, on behalf of CoBank, faxed to the Cooperative a letter of notice of default on the loan, based on its $1.6 million reported loss and violation of the $1 million working capital contingency. In the letter, he identified the Cooperative's debt to CoBank at over $11 million, advised that CoBank was suspending monetary advances on the Cooperative's seasonal line of credit, and stated, "We recommend only expenses necessary to safeguard the

---

[1] On appeal, the Cooperative does not provide any evidence disputing Mr. Ehret's contention he committed to only "back-to-back" grain transactions, which we understand involves a transaction or contract garnering a price from a grain buyer equal to the price to be paid to the grower. *See Interior Elevator Co. v. Limmeroth*, 565 P.2d 1074, 1075 n.1 (Or. 1977).

assets and maintain critical operations be incurred while repayment is made. ... *You may also want to reassess your ability to continue* credit sales, ordering supplies/inventories, or *purchasing grain*, in light of this Notice." (Emphasis added.)

On Sunday, September 24, 2000, even before CoBank sent the letter of default, Cooperative officials, in anticipation of possibly filing for bankruptcy, scheduled a meeting for the next day with a group of bankruptcy attorneys. On Monday, September 25, 2000, at 9:00 a.m., the Cooperative's president and chief executive officer, chief financial officer, board chairman, and legal counsel met for approximately four hours with bankruptcy attorneys, who discussed the time frame for filing bankruptcy and the need to file in a timely manner if the Cooperative elected to file for bankruptcy. During this time, the Cooperative continued aggressive purchases of grain, even though by Monday, September 25, 2000, CoBank's default notice advised it to reassess its ability to continue purchasing grain and its representatives were "on pins and needles" wondering how they would "pay people."

On the same day, Monday, September 25, 2000, a Cooperative employee

requested and received from CoBank credit manager Dennis Blick the amount of $60,000 for payment on a margin call on grain. That evening, the Cooperative's Board of Directors held a special meeting at which its counsel suggested the board retain the same bankruptcy attorneys from the morning meeting to handle the bankruptcy filing. During that meeting, Mr. Dumler called Mr. Ehret and asked if the Cooperative could buy grain, to which Mr. Ehret again generally approved back-to-back grain purchases without reference to amount.

The next morning, Tuesday, September 26, 2000, the Cooperative's Board of Directors met with the same bankruptcy attorneys and again discussed the possibility of filing for bankruptcy. While the exact time is in dispute, it is undisputed that on the same day the Cooperative's chief executive officer, Mr. Dumler, requested approval from Mr. Blick for an advance of $4,056,969.95 to the Cooperative to pay for grain ($3.2 million), freight ($719,000), and payroll ($160,000). This amount was more than twice the amount the Cooperative had ever requested from CoBank during its entire loan history and consisted of unsecured creditor expenses. During a conference call later that day, CoBank declined to advance the $4 million requested. The next day, Wednesday, September 27, 2000, the Cooperative filed a petition for Chapter 11 bankruptcy in

the federal bankruptcy court in Kansas, and any further discussions or requests for monetary advances apparently ceased.

Following receipt of a demand letter from the Cooperative asserting its intention to file a lawsuit against CoBank, CoBank filed a complaint for declaratory relief. In response, the Cooperative filed counterclaims against CoBank for breach of written contract, breach of oral contract, breach of duty of good faith and fair dealing, fraud, breach of fiduciary duty, and tortious interference with contract, but eventually abandoned its breach of oral contract claim which it based on CoBank's verbal commitments of continued monetary advances for grain, utilities, and payroll. Following extensive briefing on CoBank's motion for summary judgment on the Cooperative's counterclaims, the district court granted summary judgment in favor of CoBank and against the Cooperative for the reasons articulated hereafter. This appeal followed, in which the Cooperative contends the district court erred in granting summary judgment to CoBank and renews its claims of breach of written contract, breach of duty of good faith and fair dealing, fraud, breach of fiduciary duty, and tortious interference with contract. We address each claim in turn, noting the claims raised by the Cooperative are based on the same operative facts in support of its

abandoned breach of oral contract claim but stated under different legal theories in an apparent attempt to find some means of success on at least one theory.

## II.  Discussion

### A.  Summary Judgment Standard of Review

To begin, we review *de novo* the district court's summary judgment decision, examining the record and drawing all reasonable inferences in the light most favorable to the non-moving party.  *See Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1196 (10th Cir. 2005).  Summary judgment is appropriate if the record shows there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  *Id.* (relying on Fed. R. Civ. P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In considering summary judgment determinations, we may affirm the district court's grant of summary judgment for any reason supported by the record.  *See Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005).  In considering disputed facts, we have held mere allegations unsupported by other evidence are insufficient to survive a motion for summary judgment.  *Id.*

### B.  Breach of Written Contract and Covenant of Good Faith and Fair Dealing

The Cooperative suggests summary judgment is inappropriate based on CoBank's refusal to honor Mr. Ehret's verbal commitments to advance funds for grain and other general expenses after its material default. It asserts these commitments modified the written agreement, and CoBank's failure to later advance the $4 million requested breached not only the written loan agreement but the covenant of good faith and fair dealing implied in every contract.[2]

This claim resembles the breach of oral contract claim the Cooperative admits it abandoned before the district court because it could not succeed on such a claim under either Colorado or Kansas statute of frauds laws. Specifically, the

---

[2] On appeal, the Cooperative also summarily contends a borrowing provision in the loan agreement somehow breached the covenant of good faith and fair dealing because it prohibited the Cooperative from borrowing additional operating funds from another lender without first obtaining CoBank's written approval. Specifically, the borrowing provision prohibits the Cooperative from incurring indebtedness or liability for borrowed money, except for: (1) debt to CoBank; (2) accounts payable to trade creditors; (3) current operating liabilities; (4) indebtedness to its member investment program; and (5) debt to existing creditors, not to exceed certain express amounts. We decline to address this issue further on appeal, given: (1) the Cooperative fails to show how inclusion of the borrowing provision, to which the Cooperative agreed as part of the written terms and conditions of the loan agreement, breached the covenant of good faith and fair dealing implied in every contract; (2) it provides no explanation or examples on appeal of the borrowing provision's application or misuse; and (3) it fails to direct us to any portion of the record in which the issue was raised prior to appeal. *See Smith v. Rogers Galvanizing Co.*, 128 F.3d 1380, 1385-86 (10th Cir. 1997) (stating "[g]enerally, we will not consider an issue that was not raised and resolved in the trial court").

Colorado statute of frauds provides no debtor or creditor may maintain an action relating to a credit agreement involving a principal amount in excess of $25,000, unless the credit agreement is in writing and signed by the party against whom enforcement is sought. *See* Colo. Rev. Stat. § 38-10-124(2). Similarly, the applicable Kansas statute of frauds states no debtor or creditor may maintain an action for legal or equitable relief or a defense based on failure to perform a credit agreement, unless the material terms and conditions of the agreement are in writing and signed by the creditor and debtor. *See* Kan. Stat. Ann. § 16-118(a). The Colorado courts have determined *any tort claim* relating to an oral credit agreement involving a principal amount exceeding $25,000 is barred by the Colorado statute of frauds. *See Hewitt v. Pitkin County Bank & Trust Co.*, 931 P.2d 456, 459 (Colo. Ct. App. 1995); *Norwest Bank Lakewood, Nat'l Ass'n. v. GCC P'ship*, 886 P.2d 299, 302 (Colo. Ct. App. 1994). However, in Kansas, fraud appears to be an exception to the general requirement monetary promises between a lender and borrower be in writing. *See Bittel v. Farm Credit Servs. of Cent. Kan.*, 962 P.2d 491, 496-98 (Kan. 1998). Given the Cooperative abandoned its breach of oral contract claim and neither the district court nor the parties in their briefs on appeal addressed it, we decline to consider it further, other than to agree such a claim could not succeed under either state's statute of frauds.

Proceeding to the Cooperative's breach of written contract claim, it is obviously not prohibited by either state's statute of frauds. As to the breach of duty of good faith and fair dealing claim, we consider it together with the written contract claim, given both Colorado and Kansas have determined the covenant of good faith and fair dealing is implied in every written contract, *see Duffield v. First Interstate Bank of Denver*, 13 F.3d 1403, 1405 (10th Cir. 1993); *Daniels v. Army Nat'l Bank*, 822 P.2d 39, 43 (Kan. 1991), and in Colorado it is considered part of the written contract claim. *See Strey v. Hunt Int'l Res. Corp.*, 749 F.2d 1437, 1441 (10th Cir. 1984); *Centennial Square, Ltd. v Resolution Trust Co.*, 815 P.2d 1002, 1004 (Colo. Ct. App. 1991). We recognize "[c]ontractual obligations are created by state law," and "[t]he interpretation and enforcement of contracts is traditionally within the province of state courts." *Madsen v. Prudential Fed. Sav. & Loan Ass'n*, 635 F.2d 797, 802 (10th Cir. 1981). A federal district court's interpretation of state law is a question of law "reviewable *de novo* on appeal." *Vermejo Park Corp. v. Kaiser Coal Corp. (In re Kaiser Steel Corp.)*, 998 F.2d 783, 789 (10th Cir. 1993). We also recognize parties to a contract may choose a particular state's law to apply to the execution and interpretation of a contract and absent special circumstances we will honor the parties' choice of law, *see Boyd Rosene and Assoc., Inc. v. Kan. Mun. Gas Agency*, 174 F.3d 1115, 1121 (10th Cir.

1999), as will the Colorado and Kansas courts. *See Pepsi-Cola Bottling Co. of Pittsburgh v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005) (considering Kansas forum law); *Hansen v. GAB Bus. Servs., Inc.*, 876 P.2d 112, 113 (Colo. Ct. App. 1994) (considering Colorado forum law).

In this case, the loan agreement contained a forum provision stating the "agreement and each Supplement shall be governed by and construed in accordance with the laws of the State of Colorado," although neither party focuses on this provision or explicitly on Colorado law. Similarly, the district court determined that the issue of whether Kansas or Colorado law applies was not dispositive as to the written contract claim. We agree. Regardless of whether Colorado or Kansas law is applied to the loan agreement, it is unambiguous for the purpose of summary judgment under either state's law, and the district court correctly concluded the Cooperative materially breached the loan agreement when it substantially violated the working capital covenant. Therefore, CoBank was within its contractual rights and did not breach the agreement when it sent the default notice and elected not to advance the $4 million requested. Given the loan agreement contained a default provision releasing CoBank from any obligation to extend credit to the Cooperative following a default event and

allowed CoBank, on notice to the Cooperative, to terminate its commitment, CoBank did not breach the written loan agreement when it timely sent a notice of default one business day following receipt of the audit report evidencing the Cooperative's own material breach. Because any modification was required to be in writing, we disagree with the Cooperative's assertion Mr. Ehret's verbal generic representations somehow modified the written contract.

As to the issue of good faith and fair dealing, the result is the same, regardless of which state law is applied. Under Colorado law, the implied duty of good faith and fair dealing limits a party's ability to "act unreasonably in contravention of the other party's *reasonable expectations*," even if the express terms of a contractual provision appear to permit unreasonable actions. *Duffield*, 13 F.3d at 1405-06 (emphasis added). This duty applies when one party has discretionary authority to determine certain terms of the contract, such as quantity, price or time. *See Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1996) (en banc). A breach may occur "[w]hen one party uses discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract." *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1363 (Colo. Ct. App.

1994).

On the other hand, the duty of good faith and fair dealing, as interpreted by Colorado case law, "requires only that the parties to a contract perform the obligations imposed by the agreement in good faith and in a reasonable manner." *Crown Life Ins. Co. v. Haag Ltd. P'ship*, 929 P.2d 42, 46 (Colo. Ct. App. 1996). The question of good faith is determined on a case-by-case basis. *See Amoco*, 908 P.2d at 499. In Colorado, "[g]ood faith performance of a contract emphasizes faithfulness to an agreed common purpose and consistency with the *justified expectations* of the other party." *Wells Fargo*, 872 P.2d at 1363 (emphasis added). While the covenant of good faith may be relied on when the manner of the performance under the contract terms allows for discretion on the part of either party, it cannot contradict terms or conditions for which a party has bargained. *Amoco*, 908 P.2d at 498. "[T]he duty of good faith and fair dealing does not obligate a party to accept a material change in the terms of the contract[,] ... assume obligations that vary or contradict the contract's express provisions," or inject substantive terms into the contract. *Wells Fargo*, 872 P.2d at 1363. The Colorado courts have concluded that while "[e]very contract contains an implied duty of good faith and fair dealing[,] ... [w]hen that duty is

breached in most commercial contracts, the result is merely a breach of contract with standard remedies." *Id.* (quoting *Wheeler v. Reese*, 835 P.2d 572, 578 (Colo. Ct. App. 1992)).

In Kansas, the analysis is much simpler. "In dealing with good faith arguments against lenders by borrowers, ... the test of good faith is subjective and requires only honesty in fact." *Hartford v. Tanner*, 910 P.2d 872, 880 (Kan. Ct. App. 1996). Thus, in order to prevail in Kansas on a breach of duty of good faith claim, the party so alleging must offer proof of dishonesty by the other party. *See Gillenwater v. Mid-Am. Bank & Trust Co.*, 870 P.2d 700, 704 (Kan. Ct. App. 1994).

In this case, the district court resolved the good faith and fair dealing issue by concluding, "CoBank was in its discretion to decline an advance of $4 million to a defaulting-borrower. To claim otherwise would contradict the terms of the [loan agreement]." We agree with the district court's holding, but are inclined to expand on the reasons supporting the summary judgment decision. Specifically, when the Cooperative requested an advance of $4 million after informing CoBank of its material default, its expectation that it should or would receive such an

enormous sum was not in any way a "justified expectation" for the purpose of establishing a breach of duty of good faith and fair dealing, even if a representative of CoBank made verbal commitments of unspecified sums for grain and other critical expenses. Specifically, the Cooperative's expectation of receiving an advance of $4 million — more than twice the amount ever requested from CoBank and based on generic verbal commitments, working capital of just over $100,000, a loan debt of over $11 million, and while in substantial default on its loan commitment — was clearly unjustified and unreasonable. Such unreasonableness is further evidenced by its decision to aggressively purchase over $3 million worth of grain during the three or four days after it discovered its extreme financial deficiencies, based on nothing but a CoBank representative's general commitment of unspecified sums. In addition, as the district court noted, the Cooperative's own actions in entering into discussions with bankruptcy attorneys before CoBank sent the default notice and before the Cooperative requested the $4 million advance shows it did not expect to continue to receive substantial monetary assistance from CoBank. This lack of expectation is further evidenced by the fact its representatives and employees were on "pins and needles" over how the Cooperative would pay for the grain purchases in question.

Furthermore, as the district court suggested, for CoBank to have advanced $4 million on a fraction of the $1 million working capital required would have materially changed the terms of the parties' agreement. CoBank had no obligation to accept a material change in the terms of the loan agreement or to assume an obligation that varied from or contradicted its express provisions. Finally, CoBank's decision to suspend monetary advances to the Cooperative under the explicit default terms of the contract is not the type of "discretionary authority" used in determining "certain terms of the contract," and nothing in the record otherwise suggests CoBank acted "dishonestly" or "outside of accepted commercial practices." *Amoco*, 908 P.2d at 498; *Wells Fargo*, 872 P.2d at 1363. *See also Hartford*, 910 P.2d at 880; *Gillenwater*, 870 P.2d at 704. Under the circumstances presented and our standard of review, we conclude the district court did not err in granting CoBank summary judgment on the Cooperative's counterclaims based on breach of written contract and the covenant of good faith and fair dealing.

### C. Tort Claims Choice of Law Issue

In the briefs submitted on appeal, neither the Cooperative nor CoBank discuss which state law should apply to the tort claims presented, and at oral

argument neither party substantially assisted on the issue when asked to address it. Nevertheless, both parties rely on cases from both venues to support their tort claim arguments on appeal.

As previously indicated, the forum contract provision in this case requires application of Colorado law to the written loan agreement and its supplement and does not explicitly reference tort claims. While "determining the scope of a forum selection clause is a rather case-specific exercise," *Terra Int'l, Inc. v. Miss. Chem. Corp.*, 119 F.3d 688, 694 (8th Cir. 1997), generally speaking, other circuits applying state law have determined a contract forum provision cannot apply to tort claims unless the provision is broad enough to be construed to cover such claims[3] or the tort claims involve the same operative facts as a parallel breach of contract claim.[4] Admittedly, in this case, the choice of law provision appears to narrowly apply only to the loan agreement itself, although the operative facts

---

[3]  *See Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 335 (2d Cir. 2005); *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999); *Marinechance Shipping, Ltd. v. Sebastian*, 143 F.3d 216, 222-23 (5th Cir. 1998); *Thompson & Wallace of Memphis, Inc., v. Falconwood Corp.*, 100 F.3d 429, 433 (5th Cir. 1996); *Consol. Data Terminals v. Applied Digital Data Sys., Inc.*, 708 F.2d 385, 390 n.3 (9th Cir. 1983).

[4]  *See Holden Farms, Inc. v. Hog Slat, Inc.*, 347 F.3d 1055, 1061 (8th Cir. 2003); *Terra*, 119 F.3d at 695; *Lambert v. Kysar*, 983 F.2d 1110, 1121-22 (1st Cir. 1993); *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993).

supporting the Cooperative's tort claims are parallel to those presented in its breach of oral and written contract claims. Our decision on which state law applies to the tort claims raised in this case is not definitively resolved by either Kansas or Colorado case law, given the Kansas courts have not specifically addressed whether a contract forum provision applies to related tort claims, *see Ritchie Enters. v. Honeywell Bull, Inc.*, 730 F.Supp. 1041, 1046 (D. Kan. 1990), and the parties and a preliminary inquiry produce no precise answer with respect to the Colorado courts' position when a contract forum provision is at issue in a tort claim.[5] Rather than labor any further over which state law applies, we follow the district court's lead in concluding that regardless of which state law applies, the result is the same, as explained hereafter.


D. Fraud

The Cooperative's fraud claim is based on its assertion CoBank made

---

[5] Generally, in cases not involving contract forum provisions, tort claims in Kansas are considered under the state law where the tort allegedly occurred, including where the "wrong was felt" or the injured party "felt the financial harm." *See ORI, Inc. v. Lanewala*, 147 F.Supp.2d 1069, 1077-78 n.9 (D. Kan. 2001); *Ling v. Jan's Liquors*, 703 P.2d 731, 735 (Kan. 1985). In Colorado, tort claims are considered under the law of the state with "the most significant relationship" to the occurrence and the parties. *Siemens Med. Sys., Inc. v. Nuclear Cardiology Sys., Inc.*, 945 F.Supp. 1421, 1426 (D. Colo. 1996); *ITT Specialty Risk Servs. v. Avis Rent A Car Sys., Inc.*, 985 P.2d 43, 47 (Colo. Ct. App. 1998).

verbal commitments to advance funds to the Cooperative to purchase grain from various farmers over the four- or five-day period at issue. It claims CoBank did not intend to advance such funds when it made such commitments and, instead, intended to deceive and induce the Cooperative to enter into contracts to purchase such grain, and that the Cooperative reasonably relied on such inducements, entered into contracts for the purchase of grain, and sustained damages when CoBank refused to provide the money requested — namely, the $4 million. In support of its argument, the Cooperative contests the district court's determination that its fraud claim is precluded because it is based on the same allegations made in support of its abandoned oral contract claim.

We agree with the district court that the Cooperative's fraud allegations are identical or closely related to those in its abandoned breach of oral agreement claim, and under Colorado's statute of frauds, *any tort claim* relating to an oral credit agreement involving a principal amount exceeding $25,000 is barred. *See Hewitt*, 931 P.2d at 459. However, in Kansas fraud is an exception to the general requirement that any promise of monetary advancement between a lender and borrower be in writing, *see Bittel*, 962 P.2d at 496-98, so we will consider it here.

Under Kansas law, the elements of fraud include an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or with reckless disregard for the truth, on which the other party justifiably relies to his detriment. *See Bomhoff v. Nelnet Loan Servs., Inc.*, 109 P.3d 1241, 1246 (Kan. 2005). Similarly, even if we examine the Cooperative's fraud claim under Colorado law, the Cooperative must show CoBank made a false representation of a material fact, knew the representation to be false and the person to whom it was made was ignorant of its falsity, made the representation with the intention of it being acted on, and that the reliance resulted in damage. *See Nelson v. Gas Research Inst.*, 121 P.3d 340, 343 (Colo. Ct. App. 2005). More specifically, in Colorado, fraud requires more than mere nonperformance of a promise or failure to do an agreed action at a future time; instead, it requires proof the person making the representation "had the present intention not to fulfill the promise." *Id.*

In this case, given the Cooperative's material default, enormous debt, and dire financial straits, it is clear Mr. Ehret anticipated only minimal expenses and back-to-back grain sales when he generally committed to unspecified sums for necessary expenses and grain purchases for the few days at issue. The

Cooperative presents no evidence Mr. Ehret made statements known to be untrue or with the intent to deceive when he generally advised CoBank would advance sums to cover such expenses. The Cooperative's self-serving claims to the contrary are not sufficient to raise a dispute of material fact to overcome summary judgment. *See Baca*, 398 F.3d at 1216. Applying our standard of review, we conclude the district court did not err in granting CoBank summary judgment on the Cooperative's counterclaim based on fraud.

### E. Breach of Fiduciary Duty

The Cooperative insists genuine issues of material fact exist as to whether a fiduciary duty arose between it and CoBank and, if such a duty existed, whether CoBank breached that duty when it failed to advance money on its verbal commitments to cover grain and other necessary expenses. In support of its allegation of a dispute of material fact, it claims a fiduciary duty existed because CoBank controlled the Cooperative and gave it extensive business advice over many years, on which the Cooperative relied.

In both Colorado and Kansas the general rule is clear: a borrower-lender relationship creates no fiduciary duty. *See Jack v. City of Wichita*, 933 P.2d 787,

793 (Kan. Ct. App. 1997); *Daniels*, 822 P.2d at 42; *First Nat'l Bank of Meeker v. Theos*, 794 P.2d 1055, 1060 (Colo. Ct. App. 1990).  More specifically, in Kansas no special duty is created between a lender and borrower, absent fraud and conflict of interest.  *Daniels*, 822 P.2d at 42.  Given our conclusion no fraud has been established in this case and the fact the Cooperative has provided no conflict of interest argument, no fiduciary duty existed under Kansas law, and therefore, the district court did not err in determining no breach of fiduciary duty occurred.

As previously mentioned, the Colorado Court of Appeals has determined the statute of frauds precludes any tort action on oral credit agreements in excess of $25,000, including explicitly those relating to a *fiduciary duty*.  *See Norwest*, 886 P.2d at 302.  Even if we considered the Cooperative's breach of fiduciary duty claim, it would not succeed.

In Colorado, as an exception to the general rule, a fiduciary duty between a lender and borrower "may arise from a business relationship which 'impels or induces one party to relax the care and vigilance it would or should have ordinarily exercised in dealing with a stranger'" or where the borrower demonstrates a "repose of trust" and the lender likewise accepts such trust

responsibility. *Wells Fargo*, 872 P.2d at 1365. As an example, the Colorado Court of Appeals in *Wells Fargo* noted a fiduciary duty may occur where a special advisor/advisee relationship develops between the lender and borrower, unless the lender did not offer financial advice, its advice was not always heeded, or the borrower was advised by others, such as legal counsel. *Id.* In *Wells Fargo*, the court found no fiduciary duty existed between the lender and borrowers because: (1) the borrowers' claim of breach of fiduciary duty arose out of the lender's post-default conduct; (2) at the time of such post-default conduct, the borrowers did not reasonably repose a special trust and confidence in the lender or relax the care and vigilance borrowers would normally have exercised; and (3) the parties' position during the post-default conduct became adversarial, at which time both had legal representation. *Id.*

We think the situation is similar here, where the Cooperative's claim of breach of fiduciary duty is based on events following its substantial default on the loan agreement — namely, CoBank's refusal to advance $4 million following the Cooperative's default. At the time the Cooperative notified CoBank of its default, it is clear the Cooperative and CoBank's relationship was one purely of debtor and creditor, and it would have been unreasonable for the Cooperative to repose a

special trust and confidence in CoBank at a time when it was substantially in default and considering bankruptcy. Moreover, during this period, the Cooperative was relying on both its in-house counsel and its bankruptcy attorneys in order to determine whether to file bankruptcy. As a consequence, the Cooperative's allegations of a dispute of material fact as to a breach of fiduciary duty, based on its relationship with CoBank prior to its default on the loan, are immaterial for the purpose of summary judgment disposition in this case.

F. Tortious Interference

Like its other claims, the Cooperative's tortious interference claim is based on CoBank's verbal commitments to advance money to purchase grain, which the Cooperative claims induced it to enter into various grain purchase contracts, and when CoBank withdrew its credit the Cooperative was "unable to complete those grain purchase contracts."

The facts in support of the Cooperative's tortious interference claim are, as Yogi Berra would say, "*déjà vu* all over again." Like its other claims, the operative facts are remarkably similar to those in the Cooperative's abandoned breach of oral contract claim generally prohibited by both Colorado and Kansas

statute of frauds laws.  Nevertheless, even if we consider it as a separate claim, it must fail.

In Colorado, a tortious interference claim requires the offending party to "intentionally interfere" with a contract or a prospective contractual relation of another; i.e., "the interference must be both intentional and improper." *Amoco*, 908 P.2d at 500-01.  In Kansas, to establish a tortious interference claim, the injured party must show the other party "acted with malice." *Pepsi-Cola*, 431 F.3d at 1263.  In this case, the Cooperative presents no evidence of CoBank's intent to maliciously or improperly interfere with the Cooperative's grain contracts when it declined to extend credit after the Cooperative materially defaulted under the loan agreement.  It is clear any discussion or representation regarding future grain purchases was fairly generic, and any oral commitment of unspecified monetary advancements was for the purpose of protecting the Cooperative's assets, in which CoBank had an interest, and not for the purpose of intentionally or maliciously interfering with the Cooperative's grain contracts. Under these circumstances and on application of our standard of review, we conclude the district court did not err in granting summary judgment to CoBank on the Cooperative's tortious interference claim.

-26-

### III.  Conclusion

For the reasons cited in the district court's September 9, 2004 decision and those articulated herein, we **AFFIRM** summary judgment in favor of CoBank on all of the Cooperative's counterclaims.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge