**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 13, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KANSAS PENN GAMING, LLC,

       Plaintiff-Counter-Defendant-
       Appellee,

v.

HV PROPERTIES OF KANSAS, LLC,

       Defendant-Counter-Claimant-
       Appellant.

No. 10-3209

---

HV PROPERTIES OF KANSAS, LLC,

       Plaintiff-Appellant,

v.

PENN NATIONAL GAMING, INC.

       Defendant-Appellee.

No. 11-3173

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. Nos. 5:08-CV-04111-RDR-KGS & 5:08-CV-04115-RDR-KGS)**

---

C. Brooks Wood of Stinson Morrison Hecker LLC, Kansas City, Missouri (Robin K. Carlson of Stinson Morrison Hecker LLC, Kansas City, Missouri, and William M. Modrcin of Johnston, Ballweg & Modrcin, L.C., Overland Park, Kansas, with him on the briefs), for HV Properties of Kansas, LLC.

Christopher Tayback of Quinn Emanuel Urquhart & Sullivan, LLP, Los Angeles, California (Daniel C. Posner of Quinn Emanuel Urquhart & Sullivan, LLP, Los Angeles, Calfiornia; William D. Beil and Daniel B. Hodes of Rouse Hendricks

German May PC, Kansas City, Missouri, with him on the brief), for Kansas Penn Gaming, LLC, and Penn National Gaming, Inc.

Before **BRISCOE,** Chief Judge, **BALDOCK** and **LUCERO**, Circuit Judges.

**BRISCOE**, Chief Judge.

Plaintiff Kansas Penn Gaming, LLC (KPG), a limited liability corporation formed by Penn National Gaming, Inc. (Penn National), entered into a real estate sale contract with HV Properties of Kansas, LLC (HV), pursuant to which KPG purchased from HV parcels of land in southeast Kansas for $2.5 million for the purpose of seeking to develop a lottery gaming facility on the land. KPG ultimately chose not to develop a lottery gaming facility on the land. HV thus did not receive $37.5 million of payments that it had hoped to receive from KPG under the contract.

KPG filed this diversity action seeking a declaratory judgment that it did not breach the terms of the contract. HV filed a counterclaim alleging that KPG breached the terms of the contract. HV also filed a separate action against Penn National alleging breach of Penn National's obligation as guarantor to make the payments due under the contract between KPG and HV. The district court consolidated the two cases and granted summary judgment in favor of KPG and Penn National. Following the entry of judgment, the district court awarded attorneys' fees and expenses to KPG and Penn National. HV now appeals from

2

these rulings. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the judgment of the district court, as well as its post-judgment award of attorneys' fees and expenses.

I

*A. Factual history*

*1) HV Properties*

In 2003, Steve Vogel and Gary Hall, natives of the southeastern Kansas town of Galena, began efforts to bring casino gaming to Kansas. In June 2004, Vogel and Hall formed Kansans for Economic Growth for the purpose of promoting passage of gaming legislation in Kansas. In early 2005, Vogel and Hall located and obtained the rights to several parcels of real property in Cherokee County, Kansas, which had immediate access to Interstate 44 and were close to gaming markets in Oklahoma, Arkansas and Missouri (the Subject Property). The Subject Property specifically included a fee interest in approximately 112.4 acres of land, as well as options to purchase two separate tracts of land totaling approximately 294.07 acres.

On or about February 2, 2005, Vogel and Hall formed HV, a Kansas limited liability company with its principal place of business in Joplin, Missouri, and transferred their rights in the Subject Property to HV. Effective January 1, 2006, HV's membership expanded to include Tim Shallenburger and Ross Vogel, both of whom were also residents of southeast Kansas.

3

*2) HV's contact with Penn National*

In the summer of 2005, Shallenburger, who at the time was working for but was not yet a member of HV, first spoke to Richard Klemp, the Vice-President of Government Relations for Penn National, a Pennsylvania-based gaming company, about the prospect of gaming in Kansas and the possibility of Penn National developing a casino on the Subject Property. In September 2005, Klemp and Steven Snyder, Penn National's Senior Vice-President for Corporate Development, met with HV to discuss the prospects for the legalization of gaming in Kansas, visited the Subject Property, and drove through northeastern Oklahoma to look at the existing tribal casinos.

On January 11, 2006, Penn National and HV entered into a Letter of Intent that contemplated that Penn National would lease the Subject Property. Thereafter, Penn National and HV engaged in various efforts to secure the legalization of gaming in Kansas.

*3) The Kansas Expanded Lottery Act*

In April 2007, the Kansas legislature enacted the Kansas Expanded Lottery Act (KELA), Kan. Stat. Ann. § 74-8733 et seq. KELA, in pertinent part, authorized the establishment of one "lottery gaming facility" in each of four specified "gaming zones," including the "southeast gaming zone," which encompasses Cherokee and Crawford counties in the southeast corner of the State. Kan. Stat. Ann. §§ 74-8702(f), 74-8734(a) and (d). KELA anticipated that each

4

lottery gaming facility would be owned and operated by the Kansas Lottery, an independent state agency, but managed by a "lottery gaming facility manager" whose management terms and conditions would be governed by a "lottery gaming facility management contract" (management contract). Id. §§ 74-8702(n) and (o), 74-8734(a) and (d).

KELA imposes certain requirements for management contracts in the southeast gaming zone, including that (a) the casino must consist of an investment in infrastructure of at least $225 million, (b) the applicant must pay a $25 million privilege fee, and (c) the compensation paid to the lottery gaming facility manager must not exceed 73% of gaming revenues (or, in other words, the "tax rate" on the casino must not be lower than 27%). Id. §§ 74-8734(g)(2), (h)(6), (h)(12), (h)(13) and (h)(16).

KELA imposes a multi-step approval process for management contracts. The Lottery Commission first approves or disapproves proposed management contracts with the entities who have submitted timely applications to be lottery gaming facility managers for a particular gaming zone. Id. § 74-8734(d). If the Lottery Commission approves a proposed management contract, the executive director of the Kansas Lottery and the prospective lottery gaming facility manager are required to "execute the contract . . . ." Id. § 74-8736(a). "Upon execution of a . . . management contract . . . , the executive director [of the Lottery] . . . submit[s] such contract . . . to the [Review Board]," id. § 74-8736(b), which in

5

turn must determine whether "the contract is the best possible such contract," id. § 74-8736(a). If the Review Board determines that the management contract "is the best possible such contract," id., it then "submit[s] the contract to the Kansas racing and gaming commission [KRGC] for approval," id. § 74-8736(e). The KRGC in turn must, after "conduct[ing] . . . background investigations of prospective lottery gaming facility managers," "vote to approve in whole or reject in whole the recommendation of the [Review Board]." Id. The executed management contract must also be "endorse[d] by resolution of the city governing body or county commission as required in [Kan. Stat. Ann. §] 74-8734 and amendments thereto." Id. § 74-8736(a). Thus, in sum, an executed management contract becomes "binding . . . only upon" approval by the Review Board and KRGC, and endorsement by the relevant city or county governing body. Id.

*4) KPG*

In May 2007, shortly after the passage of KELA, Penn National formed Kansas Penn Gaming, LLC (KPG), a Delaware limited liability corporation, for the purpose of applying for a license to manage a gaming facility in Cherokee County, Kansas, within the southeast gaming zone. Penn National is the sole member of KPG.

*5) Cherokee County's approval of gaming and KPG*

On June 5, 2007, Cherokee County held a referendum election in which county residents could determine whether they wished to have a casino located

6

within the county. The referendum, which Penn National and HV promoted, passed with a large majority. Subsequently, on July 23, 2007, the Cherokee County Commission passed a resolution giving KPG an exclusive endorsement to be the operator of a lottery gaming facility in Cherokee County.

*6) The competing Quapaw Tribe casino project*

In May 2007, the Quapaw Indian Tribe (Quapaw) of Oklahoma announced plans to develop a large-scale casino in northeastern Oklahoma, directly across the state line from the Subject Property. At that time, and for several months thereafter, KPG was uncertain about the Quapaw's ability to obtain financing for and develop the proposed casino. KPG nevertheless viewed the Quapaw's proposed casino as a potential threat to the economic viability of a gaming facility located on the Subject Property, and consequently engaged in efforts to stop the development of the proposed Quapaw casino. Those efforts included investigating whether the proposed casino development was in violation of applicable environmental regulations, and participating in and financing a federal lawsuit against the United States Department of Interior, in which it was alleged that the federal government had improperly acquired and conveyed portions of the Quapaw's Oklahoma land, such that the land could not legally be used for gaming purposes.

*7) KPG's application for the southeast gaming zone*

On August 31, 2007, KPG applied with Kansas gaming authorities to be the

lottery gaming facility manager for the southeast gaming zone. KPG's application was the only application submitted for the southeast gaming zone prior to the expiration of the initial September 6, 2007 application deadline.

*8) The Sale Contract, Repurchase Agreement and Guaranty*

On September 6, 2007, HV and KPG entered into a real estate sale contract (the Sale Contract), pursuant to which KPG agreed to pay a total of $2.5 million to acquire HV's interest in the Subject Property. The Sale Contract also provided for two contingent payments from KPG to HV: (1) a $17.5 million payment ten days after the "Lottery Gaming Facility Management Contract Award Date" (Section 3.3 of the Sale Contract), the definition of which is discussed below; and (2) a $20 million payment on the earlier of (a) ten days after the date KPG commenced gaming operations on the Subject Property or (b) 30 months after the Lottery Gaming Facility Management Contract Award Date unless delayed due to any force majeure event (Section 3.4 of the Sale Contract).

Section 1.11 of the Sale Contract defined the phrase "Lottery Gaming Facility Management Contract Award Date" in the following manner:

> As used herein, the term "Lottery Gaming Facility Management Contract Award Date" shall mean the date upon which Buyer [KPG] has obtained all final, unappealed and unappealable licensing under the Act and Buyer has received a fully executed Lottery Gaming Facility Management Contract between Buyer and the Kansas Gaming Authority for the Subject Property to be utilized for Gaming Operations and all appeals periods with respect to the Grant and execution of such Lottery Gaming Facility Management Contract have lapsed without an appeal there from having been taken or any

8

appeal thereof having been resolved in favor of Buyer.

Aplt. App., Vol. I at 178-79.

Section 13 of the Sale Contract, entitled "Buyer's Representations and Covenants," provided, in pertinent part, as follows:

13.1    Buyer [KPG] shall use good faith commercially reasonable efforts to be designated the Lottery Gaming Facility Manager for and enter into a Lottery Gaming Facility Management Contract with respect to the Southeast Gaming Zone. Without limitation, Buyer shall make a complete and timely application for such designation and with respect to the Subject Property to the Kansas Gaming Authority by no later than the date set by the Kansas Gaming Authority as the due date for such application (subject to extensions of time that may be granted by the Kansas Gaming Authority), and shall thereafter provide such further information requested by the Kansas Gaming Authority and respond to such inquiries of the Kansas Gaming Authority regarding the application. Upon such designation, Buyer shall diligently proceed to negotiate and execute a Lottery Gaming Facility Management Contract with respect to the Subject Property. If, despite compliance with the covenants contained in this Section 13.1, Buyer is not designated the manager of the Gaming Operations in the Southeast Gaming Zone and does not receive from the Kansas Gaming Authority a fully executed final, unappealed and unappealable Lottery Gaming Facility Management Contract reasonably acceptable to Buyer, Buyer's obligation to pay the Contingent Payment pursuant to Section 3.3 shall cease and be of no further force and effect. Buyer shall own the Subject Property free and clear, subject, however, to Seller's Purchase Option (as defined in Section 28 hereof) and Buyer shall have no further obligation to Seller whatsoever under this Agreement or otherwise.

Id. at 186-87.

Attached to the Sale Contract were a number of exhibits, including Exhibit E, which was a Repurchase Agreement entered into on the same date by KPG and

9

HV. Id. at 217-18. The Repurchase Agreement, which cross-referenced certain provisions of the Sale Contract, afforded HV an option, "exercisable for a period of ninety (90) days following receipt . . . of a Notice of Termination . . . from KPG . . . , . . . to purchase the Subject Property from KPG . . . on the terms set forth in th[e] [Repurchase] Agreement." Id. at 218.

Exhibit D to the Sale Contract was a Guaranty signed by Penn National "unconditionally guarantee[ing] the payment and performance of all [KPG's] obligations under the provisions of the [Sale] Contract with respect to the Contingent Payments as provided therein." Id. at 214.

*9) Transfer of the Subject Property from HV to KPG*

On September 28, 2007, KPG, in accordance with the terms of the Sale Contract, paid $2.5 million to acquire the Subject Property from HV. On that same date, the parties completed the real estate transaction and, consequently, all of HV's rights in the Subject Property passed to KPG. KPG subsequently acquired fee title to all of the Subject Property through the exercise of options assigned to it by HV.

*10) KPG's application for the south central gaming zone*

In August 2007, at approximately the same time that KPG was working on the project in the southeast gaming zone, Penn National began exploring the possibility of applying for a management contract to be the lottery gaming facility manager for the south central gaming zone (specifically in the town of

10

Wellington, located within Sumner County, Kansas). In November 2007, Penn Sumner, LLC (Penn Sumner), a newly created subsidiary of Penn National, applied for a management contract in the south central zone. Three other gaming companies also submitted applications to be the lottery gaming facility manager for the south central gaming zone.

*11) Management contract negotiations between KPG and the Lottery Commission*

On December 6, 2007, the extended application deadline for the southeast gaming zone expired with no applications other than KPG's having been received. Consequently, the Lottery Commission and KPG began negotiating a management contract for the southeast gaming zone. At the time of those negotiations, KPG's efforts to stop the development of the Quapaw casino had been unsuccessful, and KPG was concerned that a $225 million casino facility (the minimum infrastructure investment required by KELA for the southeast gaming zone) would not be viable on the Subject Property in the face of competition from a Quapaw-operated casino. To attempt to mitigate that concern, KPG requested, and the Lottery Commission agreed, after obtaining an approving opinion from the Kansas Attorney General, that KPG be allowed to satisfy the $225 million infrastructure investment requirement over a period of time, starting with an initial $125 million investment, to be followed by additional spending of $100 million in specified intervals.

11

*12) KPG's Management Contract for the southeast gaming zone*

The Lottery Commission and KPG ultimately agreed upon the terms of a management contract for the southeast gaming zone (the Management Contract). On May 5, 2008, the Kansas Lottery and KPG signed, and thus effectively executed under the terms of KELA, that Management Contract. The Management Contract, consistent with the provisions of KELA, defined the term "Effective Date" as "the date this Agreement is signed by all the parties and all required approvals for the Agreement are obtained in accordance with the Kansas Expanded Lottery Act and rules and regulations promulgated pursuant thereto." Id. at 321-22 (Section 1(e)). The Management Contract in turn stated, again consistent with the provisions of KELA, "This Agreement will become effective and binding on the Effective Date." Id. at 324 (Section 2). The Management Contract further provided, "This Agreement will not become effective until it is approved, as required by the Kansas Expanded Lottery Act, by all three of the following public entities: (a) the Commission; (b) the Lottery Gaming Facility Review Board; and (c) the Kansas Racing and Gaming Commission." Id. at 329-30 (Section 9).

The Management Contract contained a provision addressing KPG's ability to withdraw its application prior to approval by the Review Board:

> **Manager's Ability to Withdraw Application**. Manager [KPG] may withdraw its application to be a Lottery Gaming Facility Manager at any time prior to its approval by the Lottery Gaming Facility Review

12

Board. Notice of Manager's withdrawal must be given in writing to the Executive Director. If at the time of Manager's withdrawal, Manager has paid a privilege fee to the state treasurer and credited to the Lottery Gaming Facility Manager Fund, the Executive Director will promptly notify the state treasurer of Manager's withdrawal and direct the state treasurer to refund Manager's privilege payment without interest. Manager acknowledges and agrees that if it withdraws its application pursuant to this paragraph, this Agreement will be void and Manager will not be permitted to re-apply as a Lottery Gaming Facility Manager in the Southeast Kansas gaming zone unless the application process is reopened. Manager will not be permitted any refund for payments made by Manager to reimburse the Kansas Lottery or the Kansas Racing and Gaming Commission's expenses as required by this Agreement.

Id. at 353 (Section 66).

*13) KPG's privilege fee deposit*

On June 4, 2008, KPG, as required by KELA, deposited a refundable $25 million privilege fee with the Kansas State Treasurer. Under the terms of KELA, that privilege fee could be withdrawn by KPG at any time before the management contract became final and binding.

*14) Downstream's opening and impact on KPG*

On July 5, 2008, the Quapaw opened its $300 million Downstream Casino (Downstream) for business. Downstream operated under a lower tax rate than the 27 percent rate that would have applied to any casino operated in the southeast gaming zone. After Downstream opened, KPG's analysts concluded that, even with a phased capital investment, a casino on the Subject Property would not, under the terms of the executed-but-not-yet-binding Management Contract,

13

generate a sufficient return on investment to meet KPG's internal investment thresholds. Penn National and KPG did, however, believe that a casino on the Subject Property, combined with a casino in the south central gaming zone, presented a viable overall investment for the company. Consequently, Penn National and KPG made efforts to promote this "southern strategy," i.e., the operation of two commonly owned and similarly themed casinos in southern Kansas, with the Review Board.[1]

*15) Review Board hearings*

On August 21 and 22, 2008, the Review Board conducted hearings regarding KPG's Management Contract for the southeast gaming zone, and Penn Sumner's management contract for the south central gaming zone. On August 22, 2008, the Review Board voted to approve KPG's Management Contract for the southeast gaming zone. On that same date, the Review Board also voted to approve the management contract of an applicant other than Penn Sumner for the south central gaming zone. That vote effectively ended Penn Sumner's application for the south central gaming zone, and in turn ended KPG's efforts to pursue its "southern strategy."

---

[1] At the point that Penn National and KPG developed this "southern strategy," Penn Sumner had taken all the necessary steps to be selected as the manager for a gaming facility in the south central zone. In particular, Penn Sumner and the Kansas Lottery had signed a management contract for the south central gaming zone, and Penn Sumner had deposited a refundable $25 million privilege fee with the Kansas State Treasurer.

14

*16) KPG's withdrawal*

Prior to the Management Contract being approved by the KRGC and becoming final and binding, KPG made a final determination that the proposed project on the Subject Property was not "commercially viable," id. at 127, and thus would not be a reasonable investment. According to Snyder, the opening of the Downstream Casino facility "was the single most critical factor" in this determination. Id. Snyder also cited certain of KELA's requirements, including "the capital expenditure requirement of $225 million and the $25 million license fee, as well as the statutory minimum payments that the State of Kansas [would] collect from the operations of the casino facility." Id. at 128.

Consequently, on September 11, 2008, KPG notified the Kansas Lottery that it was withdrawing its application for the southeast gaming zone. Because the KRGC had not yet approved the Management Contract, the Kansas Lottery permitted KPG to withdraw its application and obtain a refund of the $25 million privilege fee it had deposited.

On September 11, 2008, KPG gave notice to HV, pursuant to Section 2 of the Repurchase Agreement, of KPG's intent to terminate the Sale Contract. HV chose not to exercise its repurchase option under the Repurchase Agreement.

*17) HV's notice of default*

On September 12, 2008, HV served a written notice of default on KPG pursuant to Section 14 of the Sale Contract and made a demand for cure in the

15

amount of $37.5 million.

## B. *Procedural history*

On September 23, 2008, KPG filed this action against HV seeking a declaration that it had no further liability to HV under the Sale Contract. HV filed an answer and counterclaim alleging that KPG breached the Sale Contract by failing to pursue final approval of its casino management contract and disclaiming any obligation to make the contingent payments due to HV under the Sale Contract. HV also filed a separate action against Penn National alleging breach of Penn National's failure as guarantor to make the payments due under the Sale Contract between KPG and HV. The district court subsequently consolidated the two cases.

On January 7, 2010, the parties filed cross-motions for summary judgment. On July 23, 2010, the district court granted Penn National's motion for summary judgment and denied HV's motion for summary judgment. The district court entered judgment in favor of Penn National that same day. HV filed a timely notice of appeal from that judgment, resulting in Appeal No. 10-3209.

KPG and Penn National moved for attorneys' fees and expenses under the terms of the Sale Contract. On May 18, 2011, the district court granted that motion in part and awarded KPG and Penn National attorneys' fees in the amount of $765,058.50 and expenses in the amount of $207,652.27. HV filed a timely notice of appeal from that decision, resulting in Appeal No. 11-3173.

16

## II

### A.  *Appeal No. 10-3209*

#### 1) Introduction

In Appeal No. 10-3209, HV argues that it was entitled to summary judgment on its breach of contract claim because the terms of the Management Contract between KPG and the Lottery Commission were, as a matter of law, reasonably acceptable to KPG.  Alternatively, HV argues that even if it was not entitled to summary judgment, genuine issues of material fact existed that precluded the district court from granting summary judgment in favor of KPG and Penn National.  Additionally, HV argues that in the event we conclude that HV is entitled to summary judgment, we should remand the case to the district court for calculation of damages and interest.  Lastly, HV argues that if we remand the case to the district court for any reason, we should order reassignment to a different district court judge.

As we shall discuss in greater detail below, we conclude that the district court properly granted summary judgment in favor of KPG and Penn National.  Consequently, we find it unnecessary to address the remand-related arguments asserted by HV.

#### 2) Standard of review

In this diversity case, the substantive law of the forum state, Kansas,

17

governs our analysis of the underlying claims.[2]  Stickley v. State Farm Mut. Auto. Ins. Co., 505 F.3d 1070, 1076 (10th Cir. 2007).  "[B]ut we are governed by federal law in determining the propriety of the district court's grant of summary judgment."  Eck v. Parke, Davis & Co., 256 F.3d 1013, 1016 (10th Cir. 2001). We thus "review[] the grant of summary judgment de novo, applying the same standards as the district court" pursuant to Federal Rule of Civil Procedure 56(c). Salazar v. Butterball, LLC, 644 F.3d 1130, 1136 (10th Cir. 2011).  Under those standards, "[w]e will affirm a grant of summary judgment if there is no genuine dispute of material fact and the prevailing party is entitled to judgment under the law."  Grynberg v. Total, S.A., 538 F.3d 1336, 1346 (10th Cir. 2008).

*3) KPG's withdrawal rights under the Sale Contract*

HV contends that it is entitled to summary judgment on its claim that KPG breached the Sale Contract because, although the Sale Contract allowed KPG to withdraw under certain conditions, those conditions were not met and the terms of the Management Contract between KPG and the Lottery Commission were, as a matter of law, reasonably acceptable to KPG.

*a. Applicable principles of Kansas substantive law*

Before examining the relevant provisions of the Sale Contract, we first review the principles of Kansas substantive law that apply to this dispute.  "The

---

[2]  Section 19 of the Sale Contract expressly provided that the Sale Contract would "be governed by the laws of Kansas."  Aplt. App., Vol. I at 192.

18

interpretation and legal effect of written instruments are matters of law . . . ."

*Carrothers Constr. Co. v. City of South Hutchinson*, 207 P.3d 231, 239 (Kan. 2009). "The primary rule for interpreting written contracts is to ascertain the parties' intent." Id. "If the terms of the contract are clear, the intent of the parties is to be determined from the contract language without applying rules of construction." Id. "Ambiguity in a contract does not appear until two or more meanings can be construed from the contract provisions." Id.

*b. Section 13.1 of the Sale Contract*

Turning to the Sale Contract, the key provision, for purposes of this case, is Section 13.1. As we have previously noted, that section, which fell under the general heading "Buyer's Representations and Covenants," provided as follows:

> 13.1 Buyer [KPG] shall use good faith commercially reasonable efforts to be designated the Lottery Gaming Facility Manager for and enter into a Lottery Gaming Facility Management Contract with respect to the Southeast Gaming Zone. Without limitation, Buyer shall make a complete and timely application for such designation and with respect to the Subject Property to the Kansas Gaming Authority by no later than the date set by the Kansas Gaming Authority as the due date for such application (subject to extensions of time that may be granted by the Kansas Gaming Authority), and shall thereafter provide such further information requested by the Kansas Gaming Authority and respond to such inquiries of the Kansas Gaming Authority regarding the application. Upon such designation, Buyer shall diligently proceed to negotiate and execute a Lottery Gaming Facility Management Contract with respect to the Subject Property. If, despite compliance with the covenants contained in this Section 13.1, Buyer is not designated the manager of the Gaming Operations in the Southeast Gaming Zone and does not receive from the Kansas Gaming Authority a fully executed final, unappealed and unappealable Lottery Gaming Facility

19

Management Contract reasonably acceptable to Buyer, Buyer's obligation to pay the Contingent Payment pursuant to Section 3.3 shall cease and be of no further force and effect. Buyer shall own the Subject Property free and clear, subject, however, to Seller's Purchase Option (as defined in Section 28 hereof) and Buyer shall have no further obligation to Seller whatsoever under this Agreement or otherwise.

Aplt. App. at 186-87.

All five sentences of Section 13.1 are relevant to this dispute. The first sentence of Section 13.1, by its express terms, imposed upon KPG the duty of acting in good faith and exercising commercially reasonable efforts in (a) seeking designation as the lottery gaming facility manager for the southeast zone, and (b) entering into a management contract with the Lottery Commission.[3] The only potential ambiguity in the first sentence arises out of its use of the phrase "enter into." The word "enter" is commonly defined, in the context of contracts, to mean "[t]o become a party to" a contract or agreement. Black's Law Dictionary (9th ed. 2009). The question in this case is whether the word "enter," and in turn the phrase "enter into," was intended by the parties to refer simply to an executed

---

[3] That overarching duty is repeated in the first sentence of Section 13.2 ("In the event that Buyer is Designated the Lottery Gaming Facility Manager for Southeast Gaming Zone under the Act and enters into a Lottery Gaming Facility Management Contract with respect to the Subject Property, Buyer shall thereafter use good faith commercially reasonable efforts to pursue and obtain any final, unappealed and unappealable permits, approvals, certificates, licenses, management contracts or other authorizations, and re-zoning, special use permits and preliminary plan approvals and building permits . . . for the construction and operation of a destination lottery gaming facility on the Subject Property in accordance with the Lottery Gaming Facility Management Contract.").

20

contract (i.e., one signed by KPG and the Lottery Commission, but not yet approved by all three of the state lottery agencies) or to a final, binding, unappealed or unappealable contract that was approved by all three of the state lottery agencies. Because other sentences of Section 13.1 use the phrase "execute" in reference to a management contract, we conclude that the parties intended for the phrase "enter into," as used in the first sentence, to mean something other than KPG's mere execution of a management contract with the Lottery Commission. In other words, we conclude that the parties intended for KPG to act in good faith and use commercially reasonable efforts to become a party to a final, binding, unappealed or unappealable management contract with the Lottery Commission.

The second and third sentences of Section 13.1 discuss in more detail two of the specific steps KPG was required to take in achieving the goals outlined in the first sentence. The second sentence (the meaning of which is not disputed by the parties) required KPG to make a complete and timely application to be designated as the lottery gaming facility manager for the southeast gaming zone (a step that KPG undisputedly accomplished). The third sentence of Section 13.1 required KPG, upon designation as the lottery gaming facility manager for the southeast gaming zone, "to negotiate and execute a . . . [m]anagement [c]ontract [with the Lottery Commission] with respect to the Subject Property" (something that, again, KPG undisputedly accomplished).

21

The third sentence did not require KPG to obtain a final, binding management contract with the Lottery Commission. Both the Sale Contract and KELA make clear that an "executed" management contract is not the same as a final, binding management contract. An "executed" management contract is simply one that has been finally negotiated and signed by the Lottery Commission and the prospective lottery gaming facility manager. A final, binding management contract is one that has both been executed and subsequently approved by all three of the requisite Kansas gaming agencies. The third and fourth sentences of Section 13.1 distinguish between these two forms of the management contract: the third sentence refers simply to "a Lottery Gaming Facility Management Contract," while the fourth sentence refers to "a fully executed final, unappealed and unappealable Lottery Gaming Facility Management Contract."

Importantly, for purposes of the dispute now before us, the fourth sentence of Section 13.1 expressly afforded KPG the opportunity to withdraw its application for the southeast gaming zone, prior to the management contract becoming final and binding by way of approval from all three lottery agencies, if the terms of the executed management contract were not "reasonably acceptable" to KPG. In other words, the fourth sentence, through its use of the phrase "reasonably acceptable to Buyer," indicated that KPG was not unconditionally bound to proceed under the management contract that it negotiated and executed

22

with the Lottery Commission. The absence of that same phrase in the third sentence indicates that KPG was not unconditionally bound by the terms of any such executed management contract.

The fifth and final sentence of Section 13.1 provided that if KPG's obligations ceased for the reasons outlined in the fourth sentence of Section 13.1, KPG would own the Subject Property, subject to HV's right to repurchase it, and would "have no further obligation to [HV] whatsoever under" the Sale Contract.

*c. The Repurchase Agreement*

Our interpretation of Section 13.1, particularly our conclusion that KPG retained the right to withdraw if the executed-but-not-yet-final management contract was not reasonably acceptable to it, is bolstered by a key provision of the Repurchase Agreement, which was attached as an exhibit to the Sale Contract. Specifically, the Repurchase Agreement defined the phrase "Notice of Termination" as follows:

> If, after KPG has applied for the necessary management contracts/agreements, licenses and/or other regulatory approvals necessary for KPG to operate a destination lottery gaming facility under Kansas Law, and KPG, prior to being awarded a Lottery Gaming Facility Management Contract by the Kansas Gaming Authority, determines not to proceed with developing a destination lottery gaming facility on the Subject Property, KPG shall give HV[] written notice of such intent not to proceed . . . .

Aplt. App. at 218. This language confirms that KPG retained the right, prior to being awarded a final, binding management contract with the Lottery Commission

23

(i.e., one approved by all three gaming agencies), to "determine[] not to proceed with developing a . . . lottery gaming facility on the Subject Property . . . ."

*d. HV's interpretation of the Sale Contract*

Although HV concedes that the Sale Contract afforded KPG the right to determine if the terms of its casino management contract with the Lottery Commission were "reasonably acceptable," HV contends that the Sale Contract required this determination by KPG to occur before KPG and the Lottery Commission executed the casino management contract. In turn, HV argues that KPG "received a reasonably acceptable management contract" (evidenced, HV argues, by KPG's execution of the management contract), "the threat and even existence of competition were known [to KPG] at the time of contracting," and KPG "should not be excused because its management contract included terms mandated by KELA." Aplt. Br. at 31.

HV's assertion that KPG was required to make its "reasonably acceptable" determination prior to executing a management contract with the Lottery Commission is contradicted by the plain language of Section 13.1. As we have explained, the language of Section 13.1 afforded KPG the right to decide whether the negotiated and executed management contract was "reasonably acceptable," and in turn to withdraw if necessary, prior to final approval by all three gaming

24

agencies.[4]  Although HV argues that this interpretation effectively "add[s] the word 'proposed' to the third sentence in [S]ection 13.1," we disagree.  Under the terms of both the Sale Contract and KELA, an "executed" management contract is not the same as a final, binding management contract, and thus the reference in the third sentence of Section 13.1 to KPG's "execution" of a management contract clearly meant something short of a final, binding management contract.

That leaves only HV's arguments that KPG, in making a determination whether the management contract was "reasonably acceptable" to it, was precluded from considering either (a) any contract terms mandated by KELA, or (b) competition from other casinos (or proposed casinos) near the southeast gaming zone.  The phrase "reasonably acceptable" is not defined in the Sale Contract.  Consequently, it must be accorded its "ordinary meaning."  Shutts v. Phillips Petroleum Co., 567 P.2d 1292, 1317 (Kan. 1977).  The term "reasonably" is commonly defined as "[a]ccording to reason; with good reason; legitimately; justly, properly, fairly."  Oxford English Dictionary (3d ed. 2009 & online version 2011).  In turn, the term "acceptable" is commonly defined as "[c]apable, worthy, . . . pleasing, agreeable, gratifying, or welcome."  Oxford English

_____

[4] Moreover, HV offers no explanation as to why the parties would have chosen the execution date of the management contract, rather than the date upon which the contract was approved by all three agencies, as the deadline for KPG to withdraw.  Arguably, the latter date makes more sense because, prior to approval by all three agencies, KPG could not have been expected to have taken any affirmative steps towards actually constructing a casino facility on the Subject Property.

25

Dictionary (2d ed. 1989 & online version 2011). Together, the terms mean legitimately or fairly worthy or agreeable, or, stated differently, worthy or agreeable with good reason. This definition is quite broad, and does not, as a matter of law, preclude the consideration of KELA-mandated terms of a management contract or the impacts of competition on the negotiated terms of a management contract. Indeed, we conclude as a matter of law that competition from other nearby casinos, or the threat of such competition, would have, under the terms of the Sale Contract, been a valid consideration for KPG in assessing the reasonable acceptability of the terms of the Management Contract it executed with the Lottery Commission.

HV asserts, however, that the phrase "reasonably acceptable" could only have referred to the terms of the management contract that were negotiable, i.e., those terms that were not otherwise mandated by KELA. In support, HV argues that KPG "was fully aware of the statutory requirements when it signed the [Sale] Contract . . . ." Aplt. Br. at 40. For the reasons already discussed, however, the phrase "reasonably acceptable" has a broad meaning, and thus cannot be narrowly construed to have excluded KPG's consideration of KELA-mandated terms.

Lastly, and relatedly, HV argues that if KPG "could reject the [executed] management contract due to th[e] terms [of KELA]," that would "remove[] all meaning from the first, third and fourth sentences of [S]ection 13.1 because under the circumstances it would have been impossible for [KPG] to negotiate and

26

receive a reasonably acceptable management contract." Id. at 41. But that is quite clearly not the case. According to the uncontroverted evidence in the record, it was the combination of certain KELA-mandated terms, plus the significant threat of competition (and, in turn, the reduced revenues that would flow from a casino on the Subject Property), that ultimately led KPG to reject the terms of the executed management contract and withdraw from the project.

Thus, in sum, we conclude that the language of the Sale Contract did not, as a matter of law, mandate the entry of summary judgment in HV's favor or preclude the entry of summary judgment in KPG's and Penn National's favor.

*4) Did genuine issues of material fact preclude summary judgment?*

HV argues, in the alternative, that even "[i]f the record does not require summary judgment for [it], there are genuine issues of material fact which preclude summary judgment for [KPG and] Penn [National]." Aplt. Br. at 32. More specifically, HV argues that genuine issues of material fact existed concerning (a) whether a casino on the Subject Property was economically viable, and (b) whether KPG acted in good faith and with commercially reasonable efforts in seeking to obtain a final, binding management contract. We disagree.

*a. The economic viability of the proposed casino*

The fourth sentence of Section 13.1 of the Sale Contract expressly afforded KPG the right to withdraw its application for the southeast gaming zone, prior to the executed management contract with the Lottery Commission becoming final,

27

if the terms of that executed management contract were not "reasonably acceptable" to KPG. In arguing that genuine issues of material fact existed that precluded summary judgment, HV ignores this contractual language and instead attempts to reframe the inquiry as whether the proposed casino was, as a matter of law, economically viable. For example, HV notes that it provided the district court with expert testimony indicating that the proposed casino was viable. Aplt. Br. at 54. Clearly, however, that is not the proper focus under the language of Section 13.1. Under the contractual language, the only question is whether or not the executed management contract was "reasonably acceptable" to KPG. And on that critical question, HV has failed to come forward with any evidence creating a genuine issue of material fact.

To be sure, HV does complain that the district court "relied on conclusory statements in Snyder's affidavit as undisputed facts," particularly "recitations that [KPG] determined the . . . casino was not a viable investment as a result of the opening of the Downstream casino." Aplt. Br. at 50. According to HV, "[t]his assertion was contrary to [the] deposition testimony" of Snyder and Timothy Wilmott, the chief operating officer of Penn National. Id. However, HV fails to cite to any specific portions of either deposition. Further, an independent review of the portions of those deposition transcripts that were included in the appendix reveals that Snyder was doubtful as to the viability of the proposed casino even prior to the opening of the Downstream casino. HV fails to explain precisely how

28

that would undercut the statements in Snyder's affidavit. Indeed, as we read it, that deposition testimony supports the assertions in Snyder's affidavit that he did not believe, because of the combination of the Downstream casino and KELA-mandated terms in the executed management contract, that the proposed casino would be sufficiently viable to justify KPG's investment.

HV also argues that KPG's decision to withdraw was inconsistent with the representations that KPG and Penn National made to "Kansas gaming authorities and others on numerous occasions," id. at 51, particularly KPG's letter "urging the Attorney General [of Kansas] to approve the [proposed] phase-in [of KELA's capital investment requirement] because [KPG's] business plan 'will succeed,'" id. (quoting Aplt. App. at 746). A review of those representations, however, establishes that KPG and Penn National merely represented to Kansas gaming authorities and others that they were hopeful that the proposed casino would be viable. For example, in the letter specifically cited by HV, KPG did not conclusively assert that its business plan would succeed, but rather asserted to the Attorney General that it had attempted to develop the best possible business plan it could think of in light of the market conditions and KELA-mandated terms: "Against all of the market data and competitive conditions (as highlighted by the Review Board's own consultants) [KPG] has made its best business judgment how to structure a business plan that will succeed taking into consideration all relevant factors." Aplt. App. at 746. Thus, neither this statement, nor any of KPG's other

29

representations, were inconsistent with KPG's ultimate determination that the terms of the executed management contract were not reasonably acceptable to it.

### b. Did KPG act in good faith and a commercially reasonable manner in seeking a final management contract?

HV also argues that genuine issues of material fact existed as to whether KPG acted in good faith and with commercially reasonable efforts in seeking to obtain a final, binding management contract with the Lottery Commission. In support, HV asserts that even "before [Penn National] saw the Downstream casino," it had "decided to abandon" the proposed casino on the Subject Property unless it was also able to build and operate a casino in the south central gaming zone. Aplt. Br. at 55. Indeed, HV asserts that "Penn"[5] acted in bad faith because it "us[ed] Cherokee as a bargaining chip to obtain the Sumner contract while having no intent to 'obtain' the Cherokee final contract unless it received both." Id. at 56.

"The duty of good faith has been defined" under Kansas law "as honesty in fact." Gillenwater v. Mid-Am. Bank & Trust Co., 870 P.2d 700, 704 (Kan. App. 1994). Although the Kansas courts have not defined the phrase "commercially reasonable efforts," they have held that the "reasonable efforts" standard often used in contracts is one "'that has diligence as its essence," but "falls short of the

---

[5] HV's appellate brief uses the term "Penn" to refer to both KPG and its parent company, Penn National. Nevertheless, most, if not all, of the actions that HV attributes to "Penn" were actually committed by Penn National, not KPG.

standard required of a fiduciary." T.S.I. Holdings, Inc. v. Jenkins, 924 P.2d 1239, 1250 (Kan. 1996) (quoting Restatement (Second) of Agency § 13, cmt. a (1957)). Good faith and reasonableness are "usually questions of fact," Estate of Draper v. Bank of Am., N.A., 205 P.3d 698, 712 (Kan. 2009), but "may be decided as a matter of law under proper circumstances," Gillenwater, 870 P.2d at 704; see Draper, 205 P.3d at 712 (same).

In this case, the initial, and ultimately fatal, problem with HV's arguments is that Penn National was not a party to the Sale Contract with HV. Thus, Penn National's actions in seeking to have a separate subsidiary appointed as the lottery gaming facility manager for the south central gaming zone are at best only marginally relevant to the critical question of whether KPG, which was a party to the Sale Contract, fulfilled its obligations of acting in good faith and employing commercially reasonable efforts in seeking a final, binding management contract for the southeast gaming zone.

Even assuming, for purposes of argument, that Penn National's actions were relevant, the evidence that HV cites in support of its assertions is, at best, meager. HV first asserts that, although Penn National originally "had no intention of applying in the south central zone because it believed the Review Board would not award two contracts to the same manager," Penn National later changed its mind after learning that "the Quapaw were attempting to finance the [then-proposed] Downstream Casino." Id. HV argues that "[t]he only logical

31

reason Penn [National] would change its mind about its chances to obtain two management contracts is that it thought its apparent willingness to develop the Cherokee casino would persuade the Review board to award it both." Id. at 56-57. Assuming this to be true, it is unclear precisely how this would allow the jury to find that KPG failed to act in good faith in seeking a final, binding management contract for the southeast gaming zone.

HV next asserts that when KPG entered into the Sale Contract in September 2007, "it knew that Quapaw had been successful in financing its casino and Snyder, who was in charge of Penn[] [National's] efforts in Kansas, testified that he then believed that [the proposed] Cherokee [casino] was no longer economically viable." Id. at 57 (citing Aplt. App. at 106-108). Although the record does establish that Snyder was long skeptical of the economic viability of the proposed casino, this does nothing to undercut the fact that KPG took numerous, substantial, and expensive steps towards obtaining a final, binding management contract for the southeast gaming zone. Further, as the district court correctly noted, nothing in the record indicates that KPG would have withdrawn from the southeast gaming zone had Penn Sumner been awarded the lottery gaming facility management contract for the south central gaming zone. In short, nothing in the record indicates that either Penn National or KPG were insincere or dishonest in promoting their "southern strategy."

HV also contends that KPG "abandoned talks with Hall directed toward

32

Hall providing part of the required capital investment and declined to seek any changes in the management contract—such as further back-loading of the investment—when given the opportunity before the Review Board to do so." Id. "Thus," HV argues, "it failed to use 'every effort' a reasonable business entity would make under the circumstances." Id. (quoting Castle Props. v. Lowe's Home Ctrs., Inc., No. 98 CA 185, 2000 WL 309395, at *3 (Ohio Ct. App. Mar. 20, 2000)). HV fails, however, to point to any evidence that would reasonably establish that a contribution by Hall toward the required capital investment, or further back-loading of that investment, would have significantly improved the potential return on KPG's investment or, in turn, altered KPG's determination that the proposed casino was not economically viable. Thus, a jury could not reasonably have found that KPG was required to take either of these steps in fulfilling its contractual duties under the Sale Contract.

Finally, HV contends that all of this evidence "supports an inference that Penn[] [National's] plan was to block other southeast zone applicants and then to hold HV['s] . . . property and the Cherokee Casino hostage to its plan to obtain the Sumner County contract." Aplt. Br. at 58. In other words, HV argues, "Penn [National] hoped Cherokee would be its ticket with the Review Board to get the south central contract over its three rivals in that zone," and in doing so it failed to act in good faith towards HV. Id. at 59. We agree, however, with the rationale offered by the district court in rejecting this same contention:

33

The court finds no evidence to support such a contention. The record before the court shows that KPG adopted this strategy when it believed that a standalone casino in Cherokee County was not economically viable. Once that decision was made, KPG engaged in considerable efforts to pursue the Southern Strategy. Members of HV were aware of KPG's efforts and readily supported KPG at that time. The efforts of HV to rewrite or reinterpret the events that occurred at that time lack support. KPG clearly linked the casinos in the two counties as a final effort to make the Cherokee County project viable. HV has failed to produce any evidence that KPG would not have proceeded in Cherokee County had it been approved in Sumner. In sum, the court finds nothing to support HV's position concerning KPG's Southern Strategy.

Addendum to Aplt. Br. at 23-24.

In sum, the evidence in the record points in only one direction: that Penn National acted in good faith in proposing the "southern strategy" of having its subsidiaries manage casinos in both Cherokee and Sumner counties, and that this was indeed the only viable way of profitably operating a casino in Cherokee County, given the significant competition that such a casino would have faced from the Downstream Casino. Thus, we conclude that reasonable jurors could not have found, based upon the existence of that southern strategy, that KPG failed to use good faith, commercially reasonable efforts to obtain a final, binding management contract for the southeast gaming zone.

*5) The remaining issues*

HV asserts two additional issues in its appeal: first, that in the event this court concludes HV was entitled to summary judgment, it should "remand for the calculation of damages and interest" due to HV, Aplt. Br. at 60; and second, that

34

in the event the case is remanded to the district court for further proceedings, this court should reassign the case to a different district court judge. Because we have concluded that the district court properly granted summary judgment in favor of KPG and Penn National, it is unnecessary for us to address these remaining issues.

### B. *Appeal No. 11-3173*

In Appeal No. 11-3173, HV argues that if the district court's grant of summary judgment in favor of KPG and Penn National is reversed and the case remanded, the district court's order awarding attorneys' fees and expenses to KPG and Penn National must also be reversed. This argument is now clearly moot, given our affirmance of the district court's grant of summary judgment in favor of KPG and Penn National.

### III

The judgment of the district court, and the district court's order awarding attorneys' fees and expenses to KPG and Penn National, are AFFIRMED. Appellant HV Properties of Kansas LLC's motion for leave to file its brief under seal is GRANTED.