**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 8, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

GOL TV, INC., a Florida corporation,

        Plaintiff–Appellee,

       v.

ECHOSTAR SATELLITE
CORPORATION, a Colorado
corporation; ECHOSTAR SATELLITE,
L.L.C., a Colorado limited liability
company, n/k/a/ Dish Network, LLC,

        Defendants–Appellants.

No. 10-1435

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:08-CV-02143-PAB-MJW)**

---

Stewart McNab of Carver Schwarz McNab & Bailey, LLC, Denver, Colorado, for
Defendants–Appellants.

Christopher P. Beall of Levine Sullivan Koch & Schulz, L.L.P., Denver, Colorado, for
Plaintiff–Appellee.

---

Before **BRISCOE**, Chief Judge, **McKAY** and **O'BRIEN**, Circuit Judges.

---

**McKAY**, Circuit Judge.

---

      This is a corporate breach-of-contract case involving licensing fees for television

programming. The specific disputes in this case involve two separate issues: (1) the

calculation of licensing fees for the final ten days of the contract period, and (2) the accrual of interest for overdue payments.

## BACKGROUND

Plaintiff Gol TV produces soccer-related television programming, while Defendants EchoStar Satellite Corporation and EchoStar Satellite L.L.C. (now known as DISH Network) distribute television programming to individual viewers via satellite. From February 1, 2003, until August 1, 2008, Gol TV's programming was made available to subscribers of certain EchoStar service packages in exchange for EchoStar's payment to Gol TV of contractually determined licensing fees. Section 5.1.1 of the contract explained the monthly licensing fee would include:

> An amount derived by multiplying the average Residential Service Subscribers by the applicable monthly per Residential Service Subscriber License Fee (as specified in Exhibit B hereto). The average Residential Service Subscribers for any given reporting month shall be calculated by adding the number of Residential Service Subscribers authorized to receive the Programming Service on the last day of the reporting month and the number of Residential Service Subscribers authorized to receive the Programming Service on the last day of the prior reporting month, and dividing the resulting sum by 2.

(Appellants' App. at 242.) Although the contract did not define what was meant by the phrase "reporting month," EchoStar consistently calculated payments based on a reporting month that ran from the twenty-second day of one calendar month to the twenty-first day of the next month.

When the contractual arrangement terminated on August 1, 2008, EchoStar was several months in arrears on its payments. In September 2008, Gol TV sent EchoStar a

demand letter requesting payment of the overdue amounts, but EchoStar still failed to make any payment. On October 3, 2008, Gol TV filed a federal complaint on the basis of diversity jurisdiction, raising claims of breach of contract and quantum meruit. More than one month later, on November 17, 2008, EchoStar finally paid Gol TV the overdue amounts for the period between March 22 and July 21. For the final ten days of the contract, however, EchoStar paid Gol TV only $38,724.42, less than one-sixth of the amount EchoStar paid for each of the preceding full reporting months. To reach this figure, EchoStar calculated the "average Residential Service Subscribers" under the contract by adding the number of subscribers on July 21 (1,397,520) to the number of subscribers on August 21 (zero) and dividing by two. After thus effectively cutting in half the true average number of subscribers during the service period, EchoStar then further reduced its calculated fee payments by dividing the applicable per subscriber license fee by thirty-one and multiplying by ten. EchoStar argued it was permitted to prorate the per subscriber fee in this fashion to reflect the partial month of service, since the contract described this fee as a "monthly" fee.

On cross motions for summary judgment, the district court held that EchoStar correctly calculated the "average Residential Service Subscribers" according to the contractual formula. The court held, however, the contract did not permit EchoStar to additionally prorate the monthly per subscriber license fee. The court thus held that EchoStar should have paid Gol TV $81,318.43 for the final ten days of the contract period.

The court additionally held that EchoStar owed Gol TV interest for its late payments of licensing fees for the reporting periods between March 21 and July 31. The court rejected EchoStar's argument that interest only began to accrue after Gol TV sent its September demand letter, since the contract did not make the accrual of interest conditional on a formal demand of interest. Pursuant to the contractual language, the court held that interest began to accrue forty-five days after the end of each reporting month. This interpretation resulted in a further award of $57,442.55 in interest.

## DISCUSSION

We review the district court's summary judgment decision de novo, applying the same standards as the district court. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). The parties agree that our interpretation of the contract in this diversity case is governed by Colorado law. Under Colorado law, "a contract must be construed to ascertain and effectuate the intent of the parties as determined primarily from the language of the contract." *East Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo. 2005). "To determine the intent of the parties, the court should give effect to the plain and generally accepted meaning of the contractual language." *Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 697 (Colo. 2009). Unless the contract is ambiguous, extrinsic evidence cannot be used to vary the terms of a written contract. *See Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008). However, a court may conditionally admit extrinsic evidence to determine whether the contract is in fact ambiguous. *See id.* In general, a court "should

-4-

not allow a hyper-technical reading of the language in a contract to defeat the intentions of the parties," *Ad Two, Inc. v. City & Cnty. of Denver*, 9 P.3d 373, 377 (Colo. 2000), and "[a]n interpretation which makes the contract or agreement fair and reasonable will be preferred to one which leads to a harsh or unreasonable result." *Hutchinson v. Elder*, 344 P.2d 1090, 1092 (Colo. 1959).

We first consider whether the district court correctly interpreted Section 5.1.1. of the contract to permit EchoStar to calculate the "average Residential Service Subscribers" using an end count of zero. As previously stated, Section 5.1.1 provides in relevant part:

> The average Residential Service Subscribers for any given reporting month shall be calculated by adding the number of Residential Service Subscribers authorized to receive the Programming Service on the last day of the reporting month and the number of Residential Service Subscribers authorized to receive the Programming Service on the last day of the prior reporting month, and dividing the resulting sum by 2.

(Appellants' App. at 242.) In the district court proceedings, Gol TV argued the phrase "reporting month" effectively meant "reporting period," whatever the duration of that period might be. Gol TV thus contended the final reporting month of the contract was the ten-day period between July 22 and July 31, meaning the "average Residential Service Subscribers" should have been calculated by adding the number of subscribers on July 21 to the number of subscribers on July 31, then dividing by two. However, we agree with the district court that the "plain and generally accepted meaning," *Copper Mountain*, 208 P.3d at 697, of the term "month" is a period of approximately thirty days, not any period of undetermined duration. *See, e.g.*, *Webster's II New College Dictionary* 711 (1995)

(listing several definitions of the term "month," all of which describe a period of time somewhere between twenty-seven and thirty-one days long). The extrinsic evidence cited by Gol TV does not indicate the term "reporting month" as used by the parties was ambiguous and could have referred to a time period other than the commonly understood meaning of the word "month." Nor are we persuaded by Gol TV's alternative argument on appeal that EchoStar should have used the average number of subscribers authorized to receive the service packages that had previously included Gol TV's programming. The plain language of the contract ties the calculation of the average to the number of subscribers "authorized to receive the Programming Service [i.e., Gol TV] on the last day of the reporting month." (Appellants' App. at 242.) While it is true that "average Residential Service Subscribers" calculated in this fashion underestimates the true average number of subscribers by approximately fifty percent when service stops or starts within a reporting month, this is what the unambiguous language of the contract requires.

However, we agree with the district court that EchoStar was not permitted to additionally prorate the "monthly per Residential Service Subscriber License Fee" that is multiplied by the "average Residential Service Subscribers" to determine the licensing fees owed under the contract each month. The contract nowhere provides for proration of this monthly per subscriber fee. We are not persuaded by EchoStar's argument that the word "monthly" inherently authorizes proration in order to reflect the fact that service was not provided for the entire reporting month. The contract already contains a mechanism for accounting for partial months of service, since the calculation of "average

-6-

Residential Service Subscribers" effectively cuts the licensing fee in half for any partial month of service. There is no reason to find an implied right to proration to account for partial months when the contract already contains an explicit mechanism for doing so. Indeed, finding such an implied right would lead to a harsh and unreasonable result, since it would essentially permit EchoStar to obtain a double discount on licensing fees whenever service starts or stops during a reporting month. We are also unpersuaded by EchoStar's argument that extrinsic evidence of the parties' course of conduct during the contractual period reveals an ambiguity in this term. The other instances of rate adjustments over the course of the contract differed from this situation in material respects and do not suggest any ambiguity in the phrase "monthly per Residential Service Subscriber License Fee." We conclude that the plain language of the contract does not allow EchoStar to prorate the per subscriber fee for partial months of service. We therefore affirm the district court's holding that EchoStar owed Gol TV $81,318.42 for the final ten days of the contract period.

We turn now to the question of the accrual of interest. The contract provides in pertinent part:

> 5.1 Rates and Payments. On or before the 45th day following the last day of each reporting month during the Term, EchoStar will pay to Network [i.e., Gol TV], at the address specified by Network, a license fee equal to the sum of the following 5.1.1. through 5.1.3. In the event that payments are not received by Network within forty-five (45) days after the end of the month for which payment is due, then Network may, in addition to any other rights or remedies that it may have, charge interest at a rate equal to the lesser of one percent (1%) per month or the maximum legal rate permitted under Colorado law

(Appellants' App. at 242.)  EchoStar argues interest does not automatically accrue under the contract because this provision states Gol TV "may . . . charge" interest, and thus interest only began to accrue when Gol TV stated in its September 2008 demand letter that it would be charging interest for EchoStar's overdue payments.  However, the contract's permissive language simply means that Gol TV may exercise its discretion not to demand the payment of interest for overdue payments.  It does not mean the accrual of interest is conditional on Gol TV making a formal demand for interest.  Nothing in the contract requires a formal demand of interest, nor does the contract tie the calculation of interest to the date of such a demand.  Under the plain terms of the contract, we agree with the district court that interest began accruing for each late payment forty-five days after each payment was due.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's decision.