FILED
United States Court of Appeals
Tenth Circuit

May 16, 2013

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

TARA BERENDES,

     Plaintiff-Appellant,

v.

GEICO CASUALTY COMPANY, a
corporation,

     Defendant-Appellee.

No. 12-4136

(D.C. No. 2:10-CV-00308-BSJ)
(D. Utah)

---

ORDER AND JUDGMENT[*]

---

Before **BRISCOE,** Chief Judge, **SEYMOUR** and **BACHARACH**, Circuit Judges.

Plaintiff Tara Berendes appeals from the district court's grant of summary

judgment in favor of defendant GEICO Casualty Company on her claim for breach of the

duty of good faith and fair dealing.  Exercising jurisdiction pursuant to 28 U.S.C. § 1291,

we affirm.

I

*Factual background*

On June 1, 2004, Tara Berendes (Berendes) and her husband Josh were driving

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

southbound on Interstate 15 (I-15) in Salt Lake County, Utah, en route from their honeymoon in California to their home in Colorado. On that same date, Utah resident Thad Goodman was driving northbound on I-15 in Salt Lake County. Goodman, traveling at an excessive rate of speed through a construction zone, lost control of his vehicle, rolled through the median, became airborne, and collided with Berendes's southbound vehicle. Goodman was killed in the accident. Berendes and Josh survived the accident, but both sustained injuries. In particular, Berendes sustained a severe closed-head injury that left her in a coma for three weeks, facial burns, multiple lacerations, a ruptured diaphragm, and a pulmonary contusion.

At the time of the accident, Goodman was a named insured under a policy of automobile liability insurance issued by GEICO Casualty Company (GEICO). The liability limits of that policy were $25,000 per person for bodily injury and $15,000 for property damage.

The day after the accident, June 2, 2004, GEICO assigned adjuster Theresa McCormack to handle the claims against the Goodman estate. On June 3, 2004, McCormack received a call from an adjuster for Progressive Insurance Company (Progressive), the automobile liability insurer for Berendes. That adjuster provided McCormack with basic facts regarding the accident and informed her that Berendes's father was overseeing things on behalf of Berendes and Josh. That same day, McCormack called Goodman's brother, who purportedly conceded the accident was Goodman's fault.

On June 7, 2004, McCormack's supervisor, Marty Brown, informed McCormack of the relevant GEICO policy limits and suggested that the injuries sustained by Berendes and Josh would likely exhaust those limits. On June 11, 2004, McCormack spoke by phone with Berendes's father, who informed McCormack that Berendes was still in a coma and that her medical bills would likely be significant. On June 17, 2004, McCormack received a copy of the police report regarding the accident. The report concluded, in pertinent part, that Goodman had been driving 75 miles-per-hour in a 55 miles-per-hour construction zone immediately prior to the accident.

On or about June 23, 2004, McCormack spoke with Rich Humpherys, an attorney representing Berendes and Josh. During that conversation, McCormack informed Humpherys that the limits of Goodman's policy with GEICO were $25,000 per person and that GEICO would tender those policy limits to Berendes and Josh. Humpherys asked McCormack to send him a copy of Goodman's policy with GEICO. Following the conversation, Humpherys faxed a letter to McCormack confirming that he was representing Berendes and Josh. The letter again requested a certified copy of Goodman's policy and requested written verification of the policy limits.

On that same day, June 23, 2004, Humpherys sent a letter to Progressive stating, in pertinent part:

> We represent the Berendeses as it relates to a UIM claim and any PIP claim that may arise out of the above accident. We understand that the opposing driver, Thad Goodman . . . , had insurance through GEICO with minimum limits of $25,000/$50,000. The adjuster for GEICO has orally indicated that it will tender its policy limits though we have not yet received written

3

confirmation.

App., Vol. 1 at 197-198.

On July 1, 2004, Humpherys faxed to McCormack medical records indicating that Berendes remained in a coma, that her brain might not be fully functional, and that she had received a tracheotomy and a feeding tube.

On July 2, 2004, McCormack sent a letter to Humpherys "acknowledg[ing] receipt of [his] letter of representation," emphasizing that GEICO would need to know "if there [we]re any Liens" from Berendes's medical providers, asking him to "provide [her] with the general information as to the extent of the injuries sustained by [Berendes and Josh] and the names and address of the treating doctors and facilities," and "enclosing Medical and Wage Authorizations to be signed by [Berendes and Josh] and returned to" her.[1] Id. at 137. During the remainder of July 2004, McCormack took the following actions in the case: submitted information necessary to check for prior insurance fraud claims possibly submitted by Berendes and Josh; logged in the medical information sent by Humpherys; received a bill from the State of Utah for property damage that occurred during the accident; and received a call from Progressive seeking a copy of Goodman's GEICO policy. On July 30, 2004, McCormack requested from GEICO's underwriting department a certified copy of Goodman's policy.

---

[1] According to McCormack, this was a form letter that she used in this case so she could "insert [information] about the liens and send it out to" Humpherys. App., Vol. 1 at 208. McCormack testified it was never her intention to require Berendes and Josh to fill out and return the medical and wage authorizations because she knew she would not need them to adjust the claim. Id. at 208-209.

4

On July 27, 2004, the University of Utah Hospital, where Berendes was taken and treated immediately following the accident, served a signed Notice of Lien in the amount of $226,000.

On August 4, 2004, Humpherys faxed a letter to McCormack complaining that he had not received the following items: a copy of Goodman's GEICO policy; written verification of the policy limits; and a certification that Goodman had no other automobile insurance. The letter urged McCormack to "treat the claims of [Berendes] . . . separate and apart from the claims of Josh," id. at 141, and he demanded on behalf of Berendes that GEICO "tender its full liability limits," "certify the policy limits," and "certify that GEICO and the Goodmans had no other applicable liability insurance," id. at 142. In addition, the letter stated that, without GEICO's "written tender of its policy limits," they would not be able to resolve Berendes's underinsured motorist claims.[2] Id.

On August 12, 2004, while McCormack was on vacation, another GEICO employee mistakenly mailed to Bryan Larson, the attorney representing Goodman's estate, the certified copy of Goodman's policy that McCormack had requested from GEICO's underwriting department. On August 23, 2004, McCormack, after returning from vacation, noted that the certified copy of the policy had been mistakenly sent to Larson. Consequently, McCormack requested another certified copy of the policy from

---

[2] On that same date, August 4, 2004, Humpherys sent a letter to Progressive demanding on behalf of Berendes that Progressive pay the full limits of its underinsured motorist coverage within fifteen days of the date of the letter. App., Vol. 1 at 203. Humpherys, however, gave no such specific deadline in his August 4, 2004 demand letter to McCormack. Id.

5

GEICO's underwriting department. McCormack also called Larson's office and was told that they would fax the policy limits to Humpherys' office. Later that day, Larson's legal assistant faxed to Humpherys a copy of the declarations page from the certified copy of the policy. It appears to be undisputed that the declarations page of the policy included, among other information, the policy number, policy limits, and the automobiles covered under the policy.

On August 23, 2004, GEICO claim administrator Bernard Putnam reviewed the file with McCormack, concluded that Berendes's claim was "worth far in excess of [GEICO's] 25k limits," and approved paying GEICO's $25,000 policy limits for both Berendes and Josh. Id. at 61. The following day, August 24, 2004, McCormack called Humpherys' office and left him a voice message stating that GEICO was tendering the policy limits, that he should have received a copy of the policy declarations page from Bryan Larson, asking what he wanted to do about the lien from the University of Utah Hospital, and informing him that GEICO needed a letter waiving subrogation from Progressive. It is undisputed that Humpherys received McCormack's voice message. Humpherys did not, however, respond to that message in any way. Nor did he convey the content of the message to Berendes and Josh.[3]

On September 16, 2004, McCormack faxed a letter to Humpherys stating:

---

[3] Humpherys later testified that he did not interpret McCormack's message as a tender of GEICO's policy limits. App. at 117. And, according to Humpherys, he was unsure whether Tara and Josh would have, at that time, agreed to accept GEICO's policy limits to settle the claim. Id. at 118.

6

As you are aware we have tendered the policy limits of $25,000/50,000 to your clients in settlement of this matter. This was tendered to you on 8/24/04. We also advised you that we have a lien from the University of Utah Hospital in the amount of $226,767.05. At this time it appears we will have to issue our check with their name listed on the check. We also need a letter from Progressive waving [sic] subrogation. Please provide us with your Tax ID number.

Id. at 144. On that same day, McCormack faxed Humpherys a copy of the Goodmans' GEICO policy. On September 20, 2004, McCormack sent a letter to Larson explaining that the policy limits had been tendered to Berendes and Josh.

On September 21, 2004, Humpherys faxed a letter to McCormack stating that he was "puzzled by [her] letter of September 16." Id. at 204. According to Humpherys, he "ha[d] no record that on August 24, 2004, [McCormack] tendered the policy limit on either Tara . . . or Josh . . . ." Id. He also stated, "[e]ven your letter of September 16, 2004, doesn't tender the limits, since it is a conditional offer." Id. Humpherys' letter did "not mention the University of Utah Hospital's lien or make a proposal on how to deal with the lien." Id. at 315.

The next day, however, Humpherys sent a letter to Progressive notifying it that GEICO "ha[d] requested that Progressive provide a letter waiving subrogation claims, before GEICO will pay its policy limits." Id. at 203. The letter further stated that, because Goodman's estate was "grossly inadequate to cover all of the Berendeses' damages, Progressive would not be entitled to pursue any subrogation." Id. Humpherys asked Progressive for "a prompt response" to his request. Id.

On September 22, 2004, McCormack faxed a letter to Humpherys stating, in

7

pertinent part:

> In response to your letter of September 21, 2004, a message was left on your voicemail on August 24, 2004 tending [sic] the policy limits to your clients. We have been speaking with Eric at Progressive who confirmed that you were aware that we had tendered the limits.
>
> * * *
>
> Now that we have your tax ID number, we will be issuing the checks made payable to the University of Utah, your office, Ms. Berendes and Mr. Berendes and Progressive Insurance Company. The check to Mr. Berendes will be issued to your firm, Mr. & Mrs. Berendes and Progressive. We understand Progressive has a right of subrogation and we have not received a letter waiving this subrogation. If this is not agreeable then please contact my office by Friday, September 24, 2004.
>
> In addition we have claims being made under the property damage portion of Ms. Goodman's policy by the Utah Department of Transportation and there was a potential claim by the man who pushed the Berendes vehicle out of the way. We have been advised he is not pursuing a claim. A letter with a release has been sent to your office offering $12,000 in settlement of the property damage claim.
>
> As indicated if we do not hear from you by Friday, the checks and releases will be issued.

Id. at 421-422.

The following day, September 23, 2004, Humpherys sent McCormack a letter stating that, "[a]s [he] recall[ed] the message [she] left on [his] voicemail, [she] did not 'tender' the policy limits, since [she] had a number of various conditions before [she was] willing to offer payment of the limits." Id. (emphasis in original). The letter further informed McCormack that Berendes and Josh could not accept her "conditional offer." Id. at 123. Humpherys also complained that McCormack had failed to supply them with

8

a certified copy of the GEICO policy. Lastly, Humpherys asserted that Progressive had no interest in GEICO's liability coverage limits.

On September 24, 2004, McCormack faxed a letter to Humpherys refuting his assertion that her tender was conditional:

> The message left on your voice mail did not have any conditions attached to it. We needed to advise you of the hospital lien, and asked how you wanted the checks issued since there was a lien.
>
> Please contact the PIP Carrier, if any and the UIM Carrier [Progressive], have them provide us with a waiver of Subrogation. We will need to have a waiver for both Mr. & Mrs. Berendes. We will issue the check to Ms. Berendes with the hospital's name on it.

Id. at 316.

On September 27, 2004, McCormack mailed to Humpherys two checks, each in the amount of $25,000, for Berendes and Josh, along with proposed releases for the bodily injury claims. The checks were intended by McCormack to pay to Berendes and Josh the policy limits.

Approximately three weeks later, on October 18, 2004, Humpherys mailed a letter to McCormack stating as follows:

> We received your letter of September 27, 2004 with the enclosed checks. Unfortunately, we are not in a position to accept your tender and release. I am accordingly returning the checks.

Id. at 239. In his subsequent deposition in this case, Humpherys explained his reasoning for rejecting the tender:

> The circumstances had now changed because by September, I felt now that there was an additional asset in the estate of Mr. Goodman that would

9

be available for recovery by Mrs. Berendes. And that would be a claim the estate had against Geico for acting in bad faith. And therefore, at this point in time, . . . I was of the opinion that the limits were no longer $25,000, and therefore, I was no longer willing to accept it.

Id. at 285.

On November 23, 2004, Progressive issued a $75,000 settlement check to Berendes. This amount was equal to the $100,000 value of the UIM coverage provided under the Progressive policy, minus the $25,000 liability coverage provided under the GEICO policy.

At some unidentified point in November 2004, Josh "reversed course and accepted GEICO's $25,000 to settle and release all his claims" against the Goodman estate. Id. at 239-240 n.3. On December 9, 2004, Josh executed a release of all claims he had against the Goodman estate and received a $25,000 check from GEICO.

The University of Utah Hospital, where Berendes was treated, released its lien on June 1, 2005. A copy of that release was sent to Humpherys on August 8, 2005. It is undisputed that Berendes could not have accepted the $25,000 policy limit settlement check until this lien was released.

On September 7, 2005, Berendes filed a personal injury action against several defendants, including the Goodman estate and the Utah Department of Transportation. Berendes's claim against the Goodman estate ultimately settled in July 2008 for $1,500,000. As part of the settlement, Goodman's estate assigned to Berendes any claims it might have against GEICO.

10

*Procedural background*

On or about March 11, 2010, Berendes, on behalf of herself and as an assignee of Goodman's estate, filed suit against GEICO in the Third Judicial District Court, West Jordan, Salt Lake County, Utah. The complaint alleged, in pertinent part, that GEICO breached the duty of good faith and fair dealing that it owed to the Goodman estate. On April 8, 2010, GEICO removed the case to federal court based on diversity jurisdiction.

On January 18, 2012, Berendes filed a motion for partial summary judgment with respect to her claim of breach of the duty of good faith and fair dealing. In support, Berendes argued that "[w]ithin three weeks of the accident, GEICO had everything it needed to make a policy-limits offer, and if it had made the offer at that time, [she and her husband] would have accepted it." Id. at 43. She further argued that GEICO "repeatedly ignore[d] reasonable requests for information, did not communicate with the claimants, and, more importantly, did not make a timely offer of settlement," instead waiting until September 2004 to offer its policy limits to her and her husband. Id. In other words, Berendes argued, "GEICO's unexplained and unexcused delay of three months in tendering the policy limits to [her], thereby exposing [the Goodman estate] to a large excess judgment, constitute[d] bad faith as a matter of law." Id. at 67. Berendes's motion urged the district court to "hold[] as a matter of law that GEICO breached the duty of good faith and fair dealing that it owed to its insureds, and reserve the issue of damages for trial." Id. at 44.

On March 6, 2012, GEICO filed a combined memorandum in opposition to

11

Berendes's motion for partial summary judgment and in support of its own motion for summary judgment. In its own motion, GEICO argued, in pertinent part:

> It was reasonable for GEICO to account for the hospital lien and potential subrogation claims of Progressive. GEICO had an obligation to the Estate of Goodman to use care in settlement of the Berendes claim so as to preclude subsequent liens or subrogation issues from being asserted against the estate. The timing of GEICO's tender of policy limits and sending settlement checks were entirely appropriate. The Berendes claim would have been completely resolved less than three months after the date of the accident had Plaintiff and/or her representatives been reasonable. Despite GEICO tendering policy limits on three occasions and actually mailing settlement checks, Plaintiff rejected the offer. Under Utah law, GEICO committed no bad faith.

Id., Vol. 2 at 500. GEICO also argued that "Plaintiff and her representatives . . . t[ook] extensive steps to try and manufacture a bad faith claim," id., including "reject[ing] . . . GEICO's tender," id. at 510.

On June 4, 2012, the district court granted summary judgment in favor of GEICO. Judgment in the case was entered on July 13, 2012. Berendes subsequently filed a timely notice of appeal.

## II

### *Standard of review*

"In this diversity case, the substantive law of the forum state, [Utah], governs our analysis of the underlying claims." Kansas Penn Gaming, LLC v. HV Prop. of Kansas, LLC, 662 F.3d 1275, 1284 (10th Cir. 2011). "But we are governed by federal law in determining the propriety of the district court's grant of summary judgment." Id. (internal quotation marks and brackets omitted). Consequently, "we review the district

12

court's summary judgment decision de novo, applying the same standards as the district court." Gol TV, Inc. v. EchoStar Satellite Corp., 692 F.3d 1052, 1055 (10th Cir. 2012). "Under those standards, we will affirm a grant of summary judgment if there is no genuine dispute of material fact and the prevailing party is entitled to judgment under the law." Kansas Penn Gaming, 662 F.3d at 1284 (internal quotation marks and brackets omitted).

*The bad faith claim*

"Bad faith," the Utah Supreme Court has said, "is merely the inverse of the implied covenant of good faith and fair dealing that inheres in all insurance contracts." U.S. Fidelity v. U.S. Sports Specialty, 270 P.3d 464, 470 (Utah 2012). The covenant of good faith and fair dealing "is implied in contracts to protect the express covenants and promises of the contract." KeyBank Nat'l Ass'n v. Sys. West Computer Res., Inc., 265 P.3d 107, 115 (Utah App. 2011) (internal quotation marks omitted). As applied to the context of an insurance policy, "an insurer's 'implied obligation of good faith performance contemplates, at the very least, that the insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim, and will thereafter act promptly and reasonably in rejecting or settling the claim.'" Jones v. Farmers Ins. Exch., 286 P.3d 301, 304 (Utah 2012) (quoting Beck v. Farmers Ins. Exch., 701 P.2d 795, 801 (Utah 1985)). "[A]n insurer [also] owes its insured a duty to accept an offer of settlement within the policy limits when there is a substantial likelihood of a judgment being rendered against the insured in excess of those limits." Campbell v. State

13

Farm Mut. Auto. Ins. Co., 840 P.2d 130, 138 (Utah App. 1992). "The test of the insurer's conduct is one of reasonableness." Id. In other words, "an insurer who acts reasonably in fulfilling its obligations under an insurance policy has no reason to fear a bad faith suit." U.S. Fidelity, 270 P.3d at 471.

In the context of this case, it is important to emphasize that "the duty of good faith and fair dealing runs to parties to an insurance contract or their privies." Cannon v. Travelers Indem. Co., 994 P.2d 824, 828 (Utah App. 2000). Thus, in this case, GEICO owed a duty of good faith and fair dealing only to the Goodman estate, its insured.

In challenging the district court's grant of summary judgment in favor of GEICO, Berendes argues on appeal that the undisputed facts of this case establish, as a matter of law, that GEICO breached the duty of good faith and fair dealing that it owed to the Goodman estate. In particular, Berendes asserts it was undisputed that: (1) Goodman was at fault in causing her injuries; (2) GEICO's employees knew within days of that accident that GEICO would ultimately tender its policy limits; (3) there was a risk of an excess verdict against the Goodman estate if GEICO did not resolve the claim promptly for the policy limits; (4) McCormack failed to timely respond to requests for information, including a certified copy of the Goodman policy, from Humpherys; (5) McCormack "could not give any reason why GEICO did not tender the policy limits within the first thirty days after receiving the claim," Aplt. Br. at 34; and (6) McCormack did not "actually tender[] [the] policy limits [until] September 27, 2004," even though she "kn[ew] that liability was clear and damages far exceeded the policy limits," id.

14

Berendes's assertions, however, either paint an incomplete or inaccurate picture of what actually occurred. To be sure, it was undisputed that Goodman was at fault in causing the accident and Berendes's resulting injuries, and that McCormack and her supervisor knew shortly after receiving Berendes's claim that GEICO would likely tender its policy limits to her. Although Berendes in turn asserts that McCormack failed to subsequently respond to Humpherys' requests for information and waited until late September 2004 to formally offer the policy limits to Humpherys, the undisputed facts, as we shall discuss in greater detail below, indicate otherwise.

Turning first to the issue of McCormack's timeliness in responding to Humpherys' requests for information, the record is undisputed that, during McCormack's initial phone conversation with Humpherys on June 23, 2004, McCormack accurately informed Humpherys of the limits of the GEICO policy. The record also establishes that McCormack responded to Humphrey's request for a certified copy of the GEICO policy by contacting GEICO's underwriting department and asking that they forward to her such a copy. Later, when McCormack learned that the certified copy of the policy provided by the underwriting department had been mistakenly sent to Bryan Larson, the attorney for the Goodman estate, she responded by (a) contacting Larson's office and requesting that they fax a copy of the declarations page of the policy to Humpherys, and (b) contacting GEICO's underwriting department and requesting another certified copy of the policy that could then be sent to Humpherys. And, when that second certified copy of the policy was provided to her by GEICO's underwriting department, she faxed a copy of it to

15

Humpherys. Thus, in sum, it is undisputed that, from the time of his initial conversation with McCormack until the time he rejected McCormack's offer of settlement, Humpherys was aware of the true limits of Goodman's policy with GEICO.

The next issue is the timeliness of McCormack's formal offer of the policy limits to Humpherys. Berendes suggests, citing Utah's Unfair Claims Settlement Practices Act, Utah Code Ann. § 31A-26-303, similar provisions of Utah's Administrative Code, and GEICO's own internal policies, that McCormack could and should have offered the policy limits within thirty days of learning of the claim. As GEICO correctly notes, however, none of the sources cited by Berendes were intended to create a private right of action in favor of a claimant. See Cannon, 994 P.2d at 828. Rather, they were intended simply to establish general standards to guide insurers (or, in the case of GEICO's own policies, its own employees) in handling claims. Id.

More importantly, the undisputed evidence establishes that McCormack believed it was necessary, before seeking to settle the claim with Humpherys, to obtain information regarding the existence of any liens arising from Berendes's medical treatment. And it is undisputed that the University of Utah Hospital, where Berendes was taken and treated immediately following the accident, served a signed Notice of Lien in the amount of $226,000 on July 27, 2004, more than thirty days after GEICO and McCormack were first notified of Berendes's claim. The record also establishes that McCormack believed that it was necessary, as part of the process of settling Berendes's claim, for GEICO to obtain a waiver of any subrogation claim from Progressive. According to the record, this did not

16

occur, nor is there any evidence that it reasonably could have occurred, within the thirty-day period now cited by Berendes. Lastly, Berendes does not seriously dispute that McCormack was acting in the best interests of the Goodman estate in seeking to obtain these two items. Thus, we reject Berendes's argument that GEICO violated its duty of good faith and fair dealing by failing to make an offer of settlement to her within thirty days of learning of her claim.

That leads to the question of precisely when McCormack formally offered the policy limits to Humpherys. In her appellate brief, Berendes asserts that this did not occur until September 27, 2004, the date that McCormack mailed the two $25,000 checks to Humpherys. But it is uncontroverted that McCormack called Humpherys on August 24, 2004, and left him a voice message informing him that GEICO was offering its policy limits for both Berendes and her husband. It is true that McCormack in her message also (a) asked Humpherys how he wanted to handle the lien from the University of Utah Hospital, and (b) informed Humpherys that GEICO would need a letter waiving subrogation from Progressive. Although Berendes asserts that these rendered GEICO's offer "conditional," she cites no law in support of that assertion, and we conclude that reasonable jurors could not find in her favor on that point. More specifically, at no time on or after August 24, 2004 (or, for that matter, anytime before that) did McCormack suggest to Humpherys that GEICO might not pay the full policy limits to Berendes. Rather, as we have already discussed, these were two administrative items that McCormack reasonably believed needed to be addressed as part of the settlement. Lastly,

17

it is also worth noting that, after Humpherys failed to respond to McCormack's August 24, 2004 oral offer of settlement, McCormack faxed a letter to Humpherys on September 16, 2004, confirming that she had offered the policy limits to Berendes in her August 24, 2004 message. Thus, we conclude there are no genuine issues of material fact concerning whether, in terms of the timing of her offer of the policy limits to Berendes, McCormack acted reasonably to protect the interests of the Goodman estate.

Lastly, we conclude that a jury could not reasonably find in Berendes's favor on her claim that GEICO's "actions (or inaction) exposed its insured to a judgment greatly in excess of its policy limits." Aplt. Br. at 30. It is undisputed that, as of the time of McCormack's August 24, 2004 offer of settlement, Humpherys possessed authority to settle Berendes's claim for the policy limits. The record also indicates that Humpherys continued to possess that authority until at least September 22, 2004, when he informed Progressive's attorney that he needed a subrogation waiver from Progressive before GEICO would pay its policy limits to Berendes. When Humpherys returned the settlement checks to McCormack in October 2004, he offered no reasons for doing so. And the only evidence in the record on appeal that provides an explanation for the rejection is Humpherys' deposition testimony indicating that he believed the Goodman estate might have a viable bad faith claim against GEICO for failing to settle in a more timely manner, and that such a claim would be potentially more valuable to Berendes than the GEICO policy limits. In short, it was Humpherys' own tactical decision that led to the rejection of GEICO's settlement offer and the subsequent filing of Berendes's suit

18

against the Goodman estate.

For the reasons stated above, we AFFIRM the district court's grant of summary judgment in favor of GEICO on Berendes's bad faith claim.


Entered for the Court


Mary Beck Briscoe
Chief Judge